699 F.2d 729
 William Paul VERKIN and Tibor W. Weston, Plaintiffs-Appellants,
v.
Jack G. MELROY, individually, Edward Nissan, individually,
Salem Square VIII, Ltd., a Limited Partnership,
and Melroy, Nissan and Company, a
corporation, Defendants-Appellees.
 No. 82-2001.
 United States Court of Appeals,
Fifth Circuit.
 March 7, 1983.
 
 Olney G. Wallis, Houston, Tex., for plaintiffs-appellants.
 Joseph S. Cohen, Joe C. Holzer, Houston, Tex., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Texas.
 Before BROWN, GOLDBERG and HIGGINBOTHAM, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 This is an appeal in a diversity suit for tortious interference with a prospective contractual relationship. Although the jury returned a verdict for the plaintiffs, the judge entered a judgment notwithstanding the verdict for the defendants, from which the plaintiffs now appeal. Finding sufficient evidence to support the jury verdict, we reverse.
 
 I. INTRODUCTION
 A. Facts
 
 2
 In late 1977 and 1978, plaintiff Verkin, a Houston real estate broker, discussed with Banfield the possibility of Verkin's acting as Banfield's broker in the sale of the Salem Square Apartments in Friendswood, Texas. Banfield advised Verkin that the selling price was $2,552,835 and that he would pay Verkin a commission of $100,000 if Verkin could find a buyer. Banfield provided Verkin with various documents regarding Salem Square; Verkin removed all identification of the seller from the documents and incorporated them into a sales package with Verkin's name on it. Verkin provided this information to several prospective buyers.
 
 
 3
 Verkin also provided the package to co-plaintiff Weston, another Houston broker. Verkin and Weston agreed that if Weston could find a buyer, Verkin and Weston would split the $100,000 commission. Weston reproduced the sales package on Weston Realty paper.
 
 
 4
 Around late February, 1978, Bolin, another Houston broker, contacted Weston and advised him that she had a potential client interested in properties such as Salem Square. Weston advised Bolin that he was co-brokering the property with another broker and that the two of them were to receive a $100,000 commission from the seller; he advised Bolin that she should look to the buyer for her commission. Weston gave Bolin a copy of the sales package; apparently someone in Bolin's office "whited out" the Weston Realty identifying marks on the package.
 
 
 5
 Bolin's potential client was defendant Melroy, a San Diego broker, who was doing business with defendant Nissan as a California corporation, defendant Melroy, Nissan and Company. Bolin advised Melroy that two other brokers were working for the seller and would receive a $100,000 commission; Melroy responded that she could add another $100,000 to the price to the defendant corporation and that Bolin and Melroy (in his capacity as broker) could split the additional $100,000 as their commission.
 
 
 6
 In spite of the fact that Melroy was advised that the asking price was firm, Melroy directed Bolin to submit a bid of $2,400,000, some $152,000 below the asking price. Weston and Verkin had already arranged a meeting with seller Banfield, so they delivered the offer without any expectation that it would be accepted. Weston had removed Bolin's name from the offer; apparently Banfield did not notice or forgot seeing Melroy's name on the offer and forgot Weston's presence at the meeting. Banfield, as expected, rejected the offer immediately. Melroy was advised that his offer was rejected. Banfield briefly took the property off the market and then advised Verkin that he had raised the price to $2,950,000, including a $300,000 increase and the $100,000 commission.
 
 
 7
 During the next two months both Verkin and Weston worked hard at selling the property and found several prospective buyers. Around May 1, 1978, Melroy contacted Bolin and told her that he would be in Houston and wanted to meet with the owner of the property. Bolin called Weston and asked him about the possibility of her arranging a meeting; Weston, believing Bolin would attend the meeting, gave Banfield's name and phone number to Bolin. Bolin contacted Banfield, who told her that the $2,950,000 price, including the $100,000 commission was firm, and agreed to the meeting. Banfield then called Verkin and asked if he knew Bolin; Verkin said that he did not know her.
 
 
 8
 Bolin then gave Banfield's name and number to Melroy; Melroy called Banfield and said that he had previously submitted an offer on the property. Because Banfield did not remember Melroy's name appearing in the offer and was unaware of the connection between Bolin and Verkin, Banfield denied that he had ever received such an offer. The next day Banfield and one of his associates, Hauser, met with Melroy. Despite Bolin's request to attend the meeting, she was excluded. At the meeting Banfield reiterated that he had not seen Melroy's previous offer. Melroy testified that at that point he showed Banfield a copy of the offer. Banfield and Hauser testified that Melroy did not show them a copy of the offer.
 
 
 9
 During the meeting Melroy did not ask Banfield about any arrangements with brokers. Banfield told Melroy that the selling price was $2,950,000, which included a $100,000 commission. Melroy and Banfield then agreed that Banfield would lower the price by $100,000 in exchange for Melroy taking care of any commission.
 
 
 10
 After the meeting, Melroy went to Bolin, accused her of failing to present his offer, and told her that her work was deserving of a $5,000 finder's fee at most. The following week Bolin saw Weston at a party, where she accused him of failing to present Melroy's original offer to Banfield. Prior to Bolin's announcement, Weston did not know that Melroy had negotiated a sale from Banfield.
 
 
 11
 Verkin and Weston subsequently met with Banfield and explained the situation to him. Banfield explained that the price had been reduced by $100,000 based on Melroy's agreement to take care of the commission and suggested that they look to Melroy for payment. Verkin and Weston wrote Melroy demanding payment. Melroy made no response and this litigation followed.
 
 B. Procedural History
 
 12
 Verkin and Weston sued the defendants in federal court under diversity jurisdiction for tortious interference with a prospective contractual relationship. This Texas cause of action was discussed by this Court in Leonard Duckworth, Inc. v. Michael L. Field and Co., 516 F.2d 952 (5th Cir.1975). The Court there stated that to recover on this cause of action, the plaintiff must show that:
 
 
 13
 (1) there was a "reasonable probability" that he would have entered into a contractual relationship; (2) defendant acted maliciously by intentionally preventing the relationship from occurring with the purpose of harming plaintiff; (3) the defendant was not privileged or justified; and (4) actual harm or damage occurred as a result.
 
 
 14
 Id. at 956.
 
 
 15
 The jury found for the plaintiffs on four special interrogatories based on the four elements of Leonard Duckworth. The trial court, on defendants' motion for judgment notwithstanding the verdict, found that the evidence did not support the jury's finding on the first two elements of Leonard Duckworth and entered a judgment for the defendants. The plaintiffs now appeal, arguing that there was evidence to support the jury's findings. We agree.
 
 II. JURY VERDICT
 
 16
 In this circuit we are guided in our review of a jury verdict by the standard of Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc).
 
 
 17
 On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence--not just that evidence which supports the non-mover's case--but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.
 
 
 18
 Keeping this in mind, we shall now review the evidence supporting the jury's findings on the first two Leonard Duckworth elements.
 
 A. Reasonable Probability
 
 19
 The first element of a tortious interference cause of action is that "there was a 'reasonable probability' that [plaintiffs] would have entered into a contractual relationship." Leonard Duckworth, supra, 516 F.2d at 956. In this context this element means that plaintiffs must show a reasonable probability that, absent Melroy's circumvention of the brokers, Verkin and Weston would have found a buyer for Banfield's property and received their commission. "It need not be absolutely certain that the prospective contract would have been made were it not for such interference. A reasonable assurance thereof in view of all the circumstances, is generally sufficient. 86 C.J.S. Torts Sec. 43, p. 959." Martin v. Phillips Petroleum Co., 455 S.W.2d 429, 435 (Tex.Civ.App.1970, no writ).
 
 
 20
 We find ample evidence to support the jury's finding. Both Verkin and Weston testified that they had other prospective buyers who might have purchased the property but for Melroy's acts. Record at II-43 to 44, III-357, IV-388. Furthermore, Melroy learned of the property through Verkin and Melroy's efforts, and it is undisputed that Banfield would have paid Verkin and Weston had he known Melroy was located through their efforts. Record at II-9, III-227 to 28. The jury was entitled to infer that Banfield would have paid Verkin and Melroy their commission had Melroy submitted his offer through the chain of brokers rather than deliberately bypassing them.
 
 
 21
 The court below believed that the length of the chain from Banfield through three brokers to Melroy made the finding of reasonable probability unsupportable. This is nothing more than a rejection of the inferences the jury was entitled to draw. "However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." Boeing, supra, 411 F.2d at 375. The jury finding of reasonable probability is supported by the evidence and must stand.
 
 B. Malicious Intent
 
 22
 The second Leonard Duckworth criterion states that the "defendant acted maliciously by intentionally preventing the relationship from occurring with the purpose of harming plaintiff." Leonard Duckworth, supra, 516 F.2d at 956. The trial judge below rejected on two grounds the jury's finding that the plaintiffs had proved the second Leonard Duckworth element. First, he found no evidence that Melroy ever knew of Verkin and Weston. Second, he found no evidence that Melroy intended to harm Verkin and Weston. We shall treat each of those theories in turn.
 
 
 23
 1. Knowledge of Verkin and Weston --To find the necessary intent on the part of the defendant to prevent the contractual relationship, the jury must necessarily find that Melroy had knowledge of the prospective contractual relationship he was accused of blocking. Cf. Frost National Bank v. Alamo National Bank, 421 S.W.2d 153, 156 (Tex.Civ.App.1967, writ ref'd n.r.e.) (knowledge of contract a necessary element of wrongfully inducing breach of contract).
 
 
 24
 The trial judge disregarded the jury's finding of malicious intent in part because there was no evidence showing Melroy knew the identity of Verkin and Weston. He believed that this lack of knowledge of their identity also precluded the requisite knowledge of the prospective contractual relationship. There is no basis in law or logic for this conclusion; all that is necessary is that the tortfeasor know that some party or parties had a prospective contractual relationship.
 
 
 25
 The jury had ample evidence to support its finding that Melroy knew that some brokers had a prospective contractual relationship that would entitle them to a commission on the sale of the apartments. First, Bolin testified that she had told Melroy in her initial discussion with him that two other brokers were to receive a $100,000 commission from the seller. Record at II-98 to 99, III-155, 160, 161, 196 to 97, 212. Second, the information package Melroy received from Bolin about the apartments had some information on the front cover obviously concealed. Plaintiff's Exhibit 19. Bolin testified that this was a common brokerage practice. Record at III-185. The jury could have inferred that a knowledgeable broker such as Melroy understood that this was done to conceal the identity of Bolin's source. In short, there was sufficient evidence to support a jury finding that Melroy knew of the prospective contractual relationship.
 
 
 26
 2. Malicious Intent --The trial court also disregarded the second Leonard Duckworth finding on the theory that no evidence supported a finding that Melroy acted with an intent to harm Verkin and Weston. While there was no direct evidence of malice, there was circumstantial evidence from which a jury could reasonably infer malice.
 
 
 27
 The record contains evidence to show the following:
 
 
 28
 (1) Melroy knew two other brokers would get a $100,000 commission if he worked through Bolin and them; see supra Part II.B.1;
 
 
 29
 (2) Melroy initiated direct contact with the seller, from which he excluded all brokers. Record at II-117, III-148;(3) At the meeting with Banfield Melroy negotiated a reduction in purchase price exactly equal to the amount of commission included in the purchase price in exchange for his agreement to "take care of" any brokerage commissions resulting from his actions. Record at III-246, 249, 295.
 
 
 30
 Thus the evidence shows that Melroy knew that other brokers normally would receive a commission, that he took steps that resulted in their losing that commission, and that he pocketed for himself the money saved. It does not require any great leap over the chasm of facts to infer from this that Melroy intended precisely the consequences of his actions that in fact resulted. The jury was certainly entitled to draw that inference from the evidence before it.
 
 CONCLUSION
 
 31
 Boeing teaches us that a jury's findings are to be left undisturbed when there is substantial evidence to support them. In this case sufficient evidence supported the jury's findings, and so they must stand. Accordingly, the trial judge's judgment notwithstanding the verdict is reversed and the case is remanded for entry of judgment in accord with the jury verdict.
 
 
 32
 REVERSED AND REMANDED WITH INSTRUCTIONS.