755 F.2d 455
 Dr. Emsley A. DAVIS, Plaintiff-Appellee Cross-Appellant,
v.
WEST COMMUNITY HOSPITAL, Dr. Robert W. Shirey, and Dr.
William G. Manax, Defendants-Appellants Cross-Appellees,
and
Harvey Kelly, B.J. Neely and Sue Pescaia, Defendants Cross-Appellees.
 No. 83-1536.
 United States Court of Appeals,
Fifth Circuit.
 March 21, 1985.
 
 R. Brent Cooper, Michael W. Huddleston, Dallas, Tex., for Manax.
 W.V. Dunnam, Jr., Waco, Tex., for West Comm. Hosp.
 Bailey & Williams, Kevin J. Keith, Dallas, Tex., for Shirey.
 LaNelle L. McNamara, Waco, Tex., for Davis.
 Joe Milner, Peter R. Meeker, Austin, Tex., for Neely, Kelly and Pescaia.
 Appeals from the United States District Court for the Western District of Texas.
 Before RUBIN, TATE, and HILL, Circuit Judges.
 ROBERT MADDEN HILL, Circuit Judge:
 
 
 1
 This is an appeal and cross-appeal on an action initiated by Dr. Emsley A. Davis against West Community Hospital, the Chairman of the Board of Trustees of the hospital (Harvey Kelly), the Administrator of the hospital (B.J. Neely), the Chief of Staff (Dr. Robert W. Shirey), the Chief of Surgery (Dr. William G. Manax) and other persons not involved in this appeal after the permanent suspension of Dr. Davis' staff privileges at the hospital. The action was brought pursuant to 42 U.S.C. Sec. 1983 and alleged a deprivation of Dr. Davis' constitutional rights; the complaint also asserted pendent state law claims for libel and tortious interference with business relationships of Dr. Davis. On this appeal the defendants contest the district court's judgment for Dr. Davis following a jury trial on claims for violation of his first amendment rights and procedural due process rights and for libel. Dr. Davis contests the judgment for the defendants on his claim for tortious interference with business relationships and for the violation of his equal protection rights. Further issues on appeal are the appropriateness of joint and several liability of the defendants, the immunity of the hospital, and the proper amount of attorneys' fees under 42 U.S.C. Sec. 1988.
 
 
 2
 On this appeal we hold as follows. The judgment for Dr. Davis for actual damages in the amount of $10,000 and reinstatement of staff privileges for the violation of procedural due process is affirmed; the judgment for the defendants on the claim of tortious interference with business relationships is also affirmed. The judgment for Dr. Davis on the first amendment claim is reversed as a matter of law based on our ruling that Dr. Davis' letters to the hospital were not protected speech; the judgment for Dr. Davis on the libel claim is reversed based on our interpretation of the jury's inconsistent answers to interrogatories such that the finding of the truth of the libel provided a complete defense as a matter of law. We reverse the judgment for the defendants on the equal protection claim on the ground that the jury's finding of constitutional violation even without a finding of actual damages entitled Dr. Davis to nominal damages of $1 and remand for entry of judgment for Dr. Davis in that amount.
 
 
 3
 As to the apportionment of damages among the defendants, we conclude that the district court erred in finding Drs. Manax and Shirey and the hospital jointly and severally liable. We reverse the award of punitive damages against the hospital as a municipal entity under the rule expressed in City of Newport v. Facts Concerts, Inc., 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981). On the procedural due process claim, we remand for the entry of judgment against the hospital for actual damages in the amount of $10,000. On the equal protection claim, we remand for the entry of judgment jointly and severally against Drs. Manax and Shirey and chairman Kelly and administrator Neely for nominal damages in the amount of $1.
 
 
 4
 Finally, we vacate the award of attorneys' fees and remand for a reconsideration by the district court of the amount of attorneys' fees to be awarded to Dr. Davis under 42 U.S.C. Sec. 1988 and the rule of Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), concerning partially prevailing plaintiffs.
 
 I. BACKGROUND AND PROCEDURAL HISTORY
 
 5
 Dr. Emsley A. Davis is a general surgeon who had staff privileges at the West Community Hospital in West, Texas. In 1981, Dr. Davis wrote several letters to hospital supervisors concerning disputes with other hospital personnel, alleged ineffective patient treatment by Dr. Manax, complaints against activities of hospital board members and more trivial matters such as the administrator Neely giving Dr. Manax the parking space Dr. Davis had been using. At approximately the same time, Dr. Davis' patient records were under investigation.
 
 
 6
 On June 22, 1981, a letter from Dr. Manax as Chief of Surgery and Dr. Shirey as Chief of Staff to Dr. Davis was read at a staff meeting. This letter summarily suspended Dr. Davis' staff privileges. The letter summarized the records of 18 of Dr. Davis' patients who had died or developed serious complications after surgery. It also referred to Dr. Davis' correspondence with hospital officials as follows:
 
 
 7
 Slanderous and untrue statements directed formally against physicians and executives of this hospital, such statements being in grievous error; virtual threats in your recent letters as to what course you will pursue if your demands and requests are not carried out.
 
 
 8
 Four days later Dr. Davis' staff privileges were reinstated by the hospital. Thereafter, numerous meetings were held by the Executive Committee and the Board of Directors of the hospital to discuss Dr. Davis' permanent suspension. A team of outside surgeons gave a negative evaluation of the 18 patient records described in the June 22 summary suspension letter as compared to selected records of other surgeons at the hospital. Dr. Davis presented evidence to a specially appointed four member hearing panel composed of Dr. Teresa Manax (the wife of Dr. Manax) and three laypersons and to a Joint Conference Committee of the Board of Directors. Finally, in January 1982, the Board of Directors permanently suspended Dr. Davis' staff privileges at the hospital.
 
 
 9
 Dr. Davis then filed his lawsuit against the hospital and various members of its staff. A jury answered special interrogatories in Dr. Davis' favor on the following claims: (1) first amendment violation; (2) equal protection violation; (3) procedural due process violation; (4) substantive due process violation; (5) libel; and (6) tortious interference with business relationships. The jury awarded actual and punitive damages on all claims with the following exceptions: no actual or punitive damages for the violation of equal protection, and only punitive damages for the violation of substantive due process.
 
 
 10
 The district court entered judgment notwithstanding the verdict as follows: it disallowed the claim for tortious interference with business relationships finding no evidence of the element of malice and no evidence of actual damage (since Dr. Davis' income increased in the year of his summary suspension); and it set aside the award of punitive damages for the violation of substantive due process, reasoning that without actual damages, evidence of either aggravating circumstances or malicious intent was necessary but not present. The court also entered judgment for $60,000 in damages against the defendants Drs. Manax and Shirey and West Community Hospital jointly and severally. The award comprised $10,000 actual and $10,000 punitive damages each for the violations of first amendment rights, procedural due process rights, and libel. The district court also awarded attorney's fees under 42 U.S.C. Sec. 1988 in the amount submitted for actual time and expenses. Finally, the court ordered reinstatement of Dr. Davis' staff privileges.
 
 II. DR. DAVIS' CLAIMS
 
 11
 (1) First Amendment
 
 
 12
 The jury determined that the initial summary suspension of Dr. Davis by Drs. Manax and Shirey was a retaliatory action in violation of his first amendment rights. We conclude, however, that as a matter of law Dr. Davis' speech was not protected by the First Amendment. Therefore, we do not reach the issue raised by the defendants that the district court erred in failing to submit a special interrogatory on the question of whether Dr. Davis would have been suspended regardless of the letters that he wrote. See Mt. Healthy City School District v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); Truly v. Madison General Hospital, 673 F.2d 763, 767 (5th Cir.), cert. denied, 459 U.S. 909, 103 S.Ct. 214, 74 L.Ed.2d 170 (1982).
 
 
 13
 The speech in question is found in several letters written by Dr. Davis to his superiors at the hospital. On March 12, 1981, Dr. Davis wrote Dr. Shirey complaining about a letter he had received from a nurse complaining about a note that he had left her about checking on a patient. In his letter, Dr. Davis requested an apology. On March 31, Dr. Davis wrote hospital administrator Neely complaining about the work of an anesthetist and requesting verification or a written retraction of the anesthetist's comments about Dr. Davis having made bad judgment calls. On June 2, Dr. Davis wrote the Chairman of the Executive Committee of the hospital criticizing Dr. Manax' patient care and alleging that Dr. Manax' ineffectiveness and inefficiency were being condoned by Dr. Shirey and Neely. Dr. Davis requested a review of Dr. Manax' cases. One day later, on June 3, he wrote the President of the hospital's Board of Directors to complain about Neely. He listed six specific incidents, five of which were personal (including a complaint that Neely had given a parking space that Dr. Davis had been using to Dr. Manax). The sixth was another complaint that Neely was overlooking the improper conduct of Dr. Manax in treating patients. In a June 15 letter to the President of the Board of Directors, Dr. Davis complained about the lack of response to the June 2 and 3 letters and added two more complaints: that the printing for the hospital was being done by a business owned by a board member and that a relative of a board member had been hired as Director of the Volunteer Service of the hospital (questioning whether the position was properly advertised and whether the pay might not be too high). His concern in these additional complaints was a conflict of interest involving board members, whom he claimed were receiving financial gain.
 
 
 14
 Although these letters were not made public (in fact, the June 15 letter was marked "personel [sic] and confidential)", some internal communications have been deemed to constitute protected speech. The Supreme Court has found an employee's (teacher's) criticisms of racially discriminatory policies and practices of the employer made only to her supervisor (principal) to be protected speech. Givhan v. Western Line Consolidated School District, 439 U.S. 410, 414, 415 n. 4, 99 S.Ct. 693, 695, 696 n. 4, 58 L.Ed.2d 619 (1979). The fact, then, that the communications here were inhouse does not necessarily destroy their protection under the First Amendment, but it is part of the context of the communication to be considered in determining whether the speech addressed a matter of public concern. See Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708, 720 (1983) ("[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record"). Although Dr. Davis has raised the issue of racial discrimination in his equal protection claim against the hospital, none of his letters made any charges of racially discriminatory policies and practices or otherwise raised matters of public concern as discussed infra.
 
 
 15
 The First Amendment protects the speech of government employees when that speech addresses a matter of public concern. A matter of public concern may be a matter of political, social, or other concern to the community. Connick, 103 S.Ct. at 1689, 75 L.Ed.2d at 719. Concerning the protection to be afforded to matters of public concern raised by government employees, the Supreme Court in Connick noted that when the employee speaks as a citizen upon such matters, the First Amendment has long been interpreted to protect that speech from being " 'chilled' by the fear of discharge." 103 S.Ct. at 1687, 1688, 75 L.Ed.2d at 717, 718. Such protected speech is contrasted with that of a government employee speaking "as an employee upon matters only of personal interest." Id., 103 S.Ct. at 1690, 75 L.Ed.2d at 720 (emphasis added). The Ninth Circuit has formulated the Connick inquiry concerning protected speech as follows:
 
 
 16
 Speech by public employees may be characterized as not of "public concern" when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies.
 
 
 17
 McKinley v. City of Eloy, 705 F.2d 1110, 1114 (9th Cir.1983). The court added:
 
 
 18
 On the other hand, speech that concerns "issues about which information is needed or appropriate to enable the members of society" to make informed decisions about the operation of their government merits the highest degree of first amendment protection.
 
 
 19
 Id. (citing Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1946)).
 
 
 20
 Most of the content of Dr. Davis' letters to his superiors at the hospital clearly involves only personal grievances against various co-workers and administrators, e.g., his demand of apologies from a nurse and an anesthetist, his complaints of Neely's lack of consideration in various matters including depriving him of his usual parking space. This airing of specific grievances against other members of the hospital with whom he has had disagreements or whom he felt had treated him improperly does not fall under the rubric of matters of public concern but, instead, falls under the banner of matters of pure personal interest.
 
 
 21
 Two issues, however, raised in Dr. Davis' letters are less clearly personal in nature: (1) his comments about the patient care provided by Dr. Manax and (2) his queries about possible conflicts of interest by two hospital board members. But even these complaints do not involve any policy or practice of the hospital; and they are related only to isolated, unsubstantiated acts by specific individuals. His request to have Dr. Manax' patient records reviewed can be construed as a personal concern to the extent that Dr. Davis knew that his own patient records were being scrutinized. Considered in their entire context, the complaints by Dr. Davis, consisting as they did of personal grievances and criticisms of isolated acts of individuals with whom he was having personal conflicts, are statements which are not protected as a matter of law by the First Amendment. Further, no particular statement touching upon a matter of potential public concern must be treated separately out of context and thereby given first amendment protection. Dr. Davis' queries about conflicts of interest by board members might become matters of public concern, but in their in-house context and as speculative inquiries they have not yet achieved that status.
 
 
 22
 Therefore, as to the first amendment claim, we find as a matter of law that Dr. Davis' speech concerned individual personnel disputes and did not address matters of public concern; and that, therefore, it is not protected speech under the First Amendment. See Connick, 103 S.Ct. 1684, 1690 & n. 7, 75 L.Ed.2d 708, 720 & n. 7; McKinley, 705 F.2d at 1114.
 
 
 23
 (2) Equal Protection
 
 
 24
 Although the jury found that four of the defendants violated Dr. Davis' equal protection rights, i.e., were primarily motivated in one or more of their actions by racial considerations, no damages were awarded on this claim. Dr. Davis argues only that the trial court erred in failing to award nominal damages, given that the jury found that his equal protection rights were violated. The Supreme Court case cited by Dr. Davis held that in the absence of proof of actual injury from a violation of a constitutional right (procedural due process), a plaintiff is entitled to recover only nominal damages (and not punitive damages). See Carey v. Piphus, 435 U.S. 247, 248, 98 S.Ct. 1042, 1044, 55 L.Ed.2d 252 (1978). Thus, Dr. Davis is entitled to an award of $1 as nominal damages. Instructions for the award of these damages are set out in part IV infra.
 
 
 25
 (3) Procedural Due Process
 
 
 26
 Only the procedures leading to the permanent suspension of Dr. Davis' privileges in January 1982 are involved in this claim, i.e., the earlier initial temporary suspension in June 1981 and the manner in which it was conducted are not part of this claim.[1] The jury answered "yes" to the special interrogatory on procedural due process which was phrased as follows: "Do you find that the hearing procedures which culminated in Plaintiff's staff privileges being permanently suspended in January, 1982, were conducted in such a manner as to violate Plaintiff's right to procedural due process?"
 
 
 27
 The hospital argues on appeal that no violation of procedural due process occurred especially in view of the great deference due a hospital's decision concerning staff privileges. The hospital cites authority that only minimal due process standards must be met: (1) the procedures of the hospital must be fair; (2) the standards set by the hospital must be reasonable; and (3) the hospital must not act arbitrarily or capriciously. See, e.g., Laje v. Thomason General Hospital, 564 F.2d 1159, 1162 (5th Cir.1977), cert. denied, 437 U.S. 905, 98 S.Ct. 3091, 57 L.Ed.2d 1134 (1978). The court's instructions to the jury concerning the requirements of due process pertinent to Dr. Davis' claim are set forth below.
 
 
 28
 Dr. Davis also claims that the hearing procedures provided for by the hospital bylaws do not meet the constitutional requirements of procedural due process.
 
 
 29
 You are instructed that a person in Plaintiff's position may not have his staff privileges terminated unless procedures are followed which comply substantially with the following:
 
 
 30
 (1) Plaintiff must be given fair notice of the charges against him;
 
 
 31
 (2) Plaintiff must be afforded a hearing with fair opportunity to cross-examine witnesses and present evidence and testimony on his own behalf; and(3) the hearing committee must not be actually biased in the manner in which the hearing was conducted.
 
 
 32
 In addition, the hospital and its board of trustees are required to follow their own rules and regulations pertaining to suspensions and hearings, substantially and in good faith.
 
 
 33
 Plaintiff alleges that the hearing process which resulted in his permanent suspension in January, 1982, did not comply with procedural due process.
 
 
 34
 The Defendants maintain that the bylaws were substantially complied with, and that all actions were taken in good faith.
 
 
 35
 The hospital does not take issue with the requirements of due process as presented by the district court, but argues instead that the evidence shows that all[2] the requirements were complied with and that therefore we should find that Dr. Davis was afforded due process as a matter of law.
 
 
 36
 Dr. Davis disputes the evidentiary claims made by the hospital. He contends in part that he was never notified in advance of meetings and that when he was finally allowed to testify before a committee (the Executive Committee), that testimony was later disregarded by the Board of Directors in making their decision. Dr. Davis and three doctors he called as witnesses also testified before a special hearing panel, the composition of which he criticizes because most of the members had no medical expertise or knowledge of hospital affairs and because the only medically knowledgeable member was Dr. Teresa Manax, the wife of Dr. Manax. See supra note 2. Dr. Davis argues that the sufficiency of each procedural step and the reasonableness and good faith of the defendants' action were factual questions properly determined by the jury.
 
 
 37
 Since there is a factual dispute[3] as to sufficiency of the hearing procedures as applied to Dr. Davis, the due process issue was properly presented to the jury. See, e.g., Conley v. Board of Trustees of Grenada County Hospital, 707 F.2d 175, 182 (5th Cir.1983). As is evident from the comparison of the hospital's version of its actions and the contrary and additional evidence pointed out by Dr. Davis, see supra note 3, Dr. Davis presented sufficient evidence of procedural irregularities at trial such that the hospital's attack on the jury's finding of a violation of procedural due process must fail. In particular, while he was allowed to present evidence during the suspension hearings conducted by the hospital, that evidence was not considered by the actual decision-making body. Dr. Davis points to the fact that the Board in overruling the Executive Committee's recommendation of a reprimand instead of suspension listened only to part of the evidence and none from him; and that the Joint Conference Committee in reaching its final decision (a split vote of four to two which resulted in suspension by the Board) did not even have before it the very lengthy record from the special hearing at which 22 hours of testimony were presented and did not discuss any specific evidence.
 
 
 38
 While the hospital urged that we find on the record that Dr. Davis did receive adequate hearing procedures and that the various levels of committees, panels, etc., properly provided additional review rather than de novo review, and especially that the special hearing panel provided an adequate hearing of the evidence (despite the questionable composition of that panel), the issue was properly a factual one presented to the jury. We will not overturn its finding on appeal and substitute ours given the evidence in the record that there was a deprivation of Dr. Davis' right to procedural due process leading up to his permanent suspension. In affirming the judgment on this claim, we must consider the appropriateness of joint and several liability of the defendants and the hospital's arguments of immunity in considering the disposition of the award of punitive damages. See parts III and IV, infra.
 
 
 39
 (4) Substantive Due Process
 
 
 40
 Dr. Davis has not appealed from any aspect of the district court's granting a judgment notwithstanding the verdict on his claim for a violation of substantive due process. Although by the same argument made concerning his equal protection claim, he would otherwise be entitled to an award of $1 in nominal damages in accordance with the jury's finding of a violation of this constitutional right, he has waived this issue on appeal. See Carey v. Piphus, 435 U.S. at 248, 1044; cf. part II(2) supra.
 
 
 41
 (5) Libel
 
 
 42
 The jury found that Drs. Manax and Shirey made libelous statements about Dr. Davis,[4] that such statements were made with actual malice, and that such statements were a proximate cause of damage to Dr. Davis. The jury also awarded him actual and punitive damages. However, the jury also found that the statements were true or substantially true. The truth of a communication is a complete defense to libel under Texas law, whether or not made with malice as it was found to be here. See, e.g., Templeton v. Rogers, 450 S.W.2d 900, 901 (Tex.Civ.App.--San Antonio 1970, writ dism'd). We hold, therefore, that the jury's finding of the truth of the statements made by Drs. Manax and Shirey is a defense to the libel claim, despite the other apparently inconsistent findings and the award of damages.
 
 
 43
 Dr. Davis challenges the jury's finding on the truthful character of the statements. Specifically, he argues that the jury's "yes" answer to the interrogatory "Do you find that any libelous statement made about the plaintiff was true or substantially true?" is a finding that only one statement was true, and that to present a defense or even a conflict with its other answers, the jury would have had to have found that all the statements were true. The defendants contend that Dr. Davis' interpretation of the interrogatory is contrary to the court's instructions to the jury, in which "any" refers to all the libelous statements that may have been made. It is the duty of the court to attempt to reconcile apparently inconsistent answers by a jury to special interrogatories. See Gallick v. Baltimore & Ohio R. Co., 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963); Wright v. Kroeger Corp., 422 F.2d 176, 178 (5th Cir.1970). Such reconciliation must be done "in light of the surrounding circumstances, including the instructions of the court." Wright, 422 F.2d at 178. Accordingly, we will consider the jury's response to the interrogatory on the truth of the statements in the light of court's instruction on that issue.
 
 
 44
 The relevant instructions to the jury on the libel claim were stated as follows:
 
 
 45
 As a defense to the claim of libel, the Defendants contend that any statements which may have been made were substantially true, and thus cannot be libelous. You are instructed that, under the laws of the state of Texas, truth or substantial truth is an absolute defense to a charge of libel.
 
 
 46
 The court's instructions clarify the meaning of "any" in the jury interrogatory concerning truth: the reference is clearly to whether the libelous statements existed at all rather than to the truth of only one statement. Therefore, the jury's finding of truth does present a complete defense to the libel claim and damages on this claim were not properly awarded. While the jury may not have fully appreciated that truth was a complete defense, and therefore proceeded to answer additional interrogatories on the libel claim and make findings of damages, the district court should have granted the motion for judgment notwithstanding the verdict on the libel claim. Accordingly, the judgment must be reversed on the libel claim.
 
 
 47
 (6) Tortious Interference with Business Relationships
 
 
 48
 The jury found that Dr. Davis' business relationships were tortiously interfered with by Drs. Manax and Shirey, administrator Neely and chairman Kelly and that the interference was a proximate cause of damage to Dr. Davis. The jury awarded him $170,000 in actual damages and $60,000 in punitive damages. The district court entered judgment notwithstanding the verdict on the claim for tortious interference with business relationships, finding there to have been no evidence of the requisite elements of malice and of any actual damages since Dr. Davis' income increased in the year of the alleged interference. We agree with the district court.
 
 
 49
 Texas law requires proof of both malice by the defendants and actual damages or loss to the plaintiff to establish tortious (or malicious) interference with business relationships. See, e.g., CF & I Steel Corp. v. Pete Sublett & Co., 623 S.W.2d 709, 713 (Tex.Civ.App.--Houston [1st Dist.] 1981, writ ref'd n.r.e.); Harshberger v. Reliable-Aire, Inc., 619 S.W.2d 478, 481 (Tex.Civ.App.--Corpus Christi 1981, writ dism'd).
 
 
 50
 a. Malice
 
 
 51
 Dr. Davis contends that he did prove the element of malice as construed by this Court in Verkin v. Melroy, 699 F.2d 729 (5th Cir.1983). In Verkin, this Court specified that the tortfeasors must have had knowledge of the prospective business relationship that they allegedly interfered with and that the evidence, which may be circumstantial evidence, must support an intent to harm the plaintiff. Id. at 733. The jury here could properly conclude that the defendants knew that Dr. Davis' business relationships with any patients he had at the hospital would be affected by the suspension of his staff privileges there. However, there is no evidence in the record, even of a circumstantial nature, to support an intent to harm Dr. Davis.
 
 
 52
 Dr. Davis on appeal has suggested only two items of evidence to establish requisite malice: that Neely had urged Dr. Shirey to get rid of Dr. Davis as early as 1980; and that Kelly threatened to suspend another doctor, Dr. Smith, "when he ... was about to discover the 'truth' about the abortive TMA review."[5]
 
 
 53
 The threats to third parties who did not agree with the summary suspension of Dr. Davis and other hospital procedures do not provide even circumstantial evidence sufficient to support a finding of malicious intent to interfere with Dr. Davis' business relationships. Certainly, the evidence indicates considerable discord between certain doctors and administrators at the hospital and serves to support the jury's finding of the denial of procedural due process, but, as the district court correctly determined, it cannot support a finding of malice as an element of tortious inference.
 
 
 54
 b. Damages
 
 
 55
 Even if the evidence were adequate to establish the element of malice, Dr. Davis has even more clearly failed to establish another essential element of the tort, i.e., that he suffered any actual damages. There is simply no evidence in the record that Dr. Davis' income level was reduced by his suspension. After the reinstatement from the June 1981 four day suspension, the evidence showed that he had no patients in the hospital at the time, received no referrals during that time, and had a higher income that year ($90,000) than the previous year ($85,000). Dr. Davis also had and used staff privileges to treat patients at two other hospitals in the area.
 
 
 56
 Therefore, the district court properly granted the motion for judgment notwithstanding the verdict on the tortious interference with business relationship claim.
 
 
 57
 III. THE HOSPITAL'S IMMUNITY FROM PUNITIVE DAMAGES
 
 
 58
 The hospital system is immune from punitive damages under 42 U.S.C. Sec. 1983. City of Newport v. Facts Concerts, Inc., 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981). Accordingly, the judgment should be modified to exclude the hospital from the punitive damages awarded under the remaining claim against it--the violation of procedural due process.
 
 IV. JOINT AND SEVERAL LIABILITY
 
 59
 The district court found Drs. Manax and Shirey and the hospital jointly and severally liable for all the damages awarded to Dr. Davis. We find the court's failure to award damages according to the liability of the defendants found in the separate jury verdicts to be error. On remand, the judgment for damages is to be apportioned in accordance with the following instructions. On the procedural due process claim, judgment is to be entered for Dr. Davis and against the hospital[6] in the amount of $10,000 for actual damages. The hospital, as discussed in part III, supra, is not liable for punitive damages. Therefore, the award of $10,000 for Dr. Davis in punitive damages on the procedural due process claim cannot stand.
 
 
 60
 The remaining damages to be awarded on remand are nominal damages: $1 for the violation of Dr. Davis' right to equal protection by Drs. Manax and Shirey and Kelly and Neely who are properly jointly and severally liable for the violations.
 
 V. ATTORNEYS' FEES
 
 61
 Only the hospital has challenged the award of attorneys' fees by the district court. It argues that Dr. Davis' attorneys received fees for all of the time expended on the case when four of the seven defendants were found not liable on any claim; the recovery for interference with business relationships (a $230,000 award in comparison to the $60,000 remainder) was denied by the court; and attorneys' fees are not recoverable for libel under Texas law.
 
 
 62
 The hospital urges that the principle established in Hensley v. Eckerhart by the United States Supreme Court precludes full recovery. See id., 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Hensley concerns civil rights actions in which attorneys' fees are sought under 42 U.S.C. Sec. 1988 and therefore applies to the present case. The Court observed that "[i]if ... a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." 103 S.Ct. at 1945, 76 L.Ed.2d at 52. If the plaintiff is only partially successful, the court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." Id. There is no question but that Dr. Davis was only partially successful in the district court. The district court, however, in its discretion, chose not to enhance the award as would be appropriate if "exceptional success" had been achieved and it disallowed the high hourly rate sought for trial work. Overall, rather than reducing the award for excessive time in preparation and less than total success, the court did not enhance the award. The court has discretion in determining how to ensure that an award is not excessive. It may have considered the hourly rate to be low or the case to have been particularly unpopular. See Johnson v. Georgia Highway Express, 488 F.2d 714 (5th Cir.1974). Since the district court considered the relationship between the extent of success and the amount of the award, it satisfied the Hensley requirement in determining the appropriate attorneys' fees.
 
 
 63
 However, in view of the lesser success of Dr. Davis after this appeal, we remand for a reconsideration of the amount of attorneys' fees, if any, to be awarded. See Thomas v. Sams, 734 F.2d 185, 193-94 (5th Cir.1984). For any attorneys' fees to be awarded, the district court must find that Dr. Davis was a "prevailing party." Hensley, 103 S.Ct. at 1943, 76 L.Ed.2d at 50. If on remand, he is found to be a prevailing party, the court must reconsider the amount of the award in view of the extent of success achieved.
 
 
 64
 The issue of whether Dr. Davis was a prevailing party was not addressed on appeal. We do not decide that issue, but note that the finding of a violation of Dr. Davis' procedural due process rights by the hospital in permanently suspending him and his reinstatement to staff privileges by the district court have not been reversed on appeal, and in our view, constitute the central issue in the case. We further observe that his reinstatement to staff privileges is, in our view, the primary relief sought. The award of attorneys' fees is vacated and remanded for reconsideration in light of Hensley and our discussion.
 
 VI. CONCLUSION
 
 65
 For the foregoing reasons, the judgment is affirmed in part and reversed in part, vacated in part, and remanded. Upon remand, the district court is instructed to enter judgment in accordance with this opinion for Dr. Davis in the amount of $10,000 and for reinstatement of his staff privileges against the hospital for the violation of his right to procedural due process, and in the amount of $1 against Drs. Manax and Shirey and chairman Kelly and administrator Neely for the violation of his right to equal protection.
 
 
 66
 The district court's award of attorneys' fees is vacated and the court is further instructed to reconsider the appropriate amount of attorneys' fees, if any, in accordance with Hensley.
 
 
 67
 For the foregoing reasons, the judgment below is AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; AND REMANDED.
 
 
 
 [1]
 Dr. Davis had requested a separate interrogatory on the violation of procedural due process by the summary suspension. The denial of this request is not before us on appeal. However, we note that a temporary suspension of staff privileges for a few days might not implicate a liberty or property interest, thereby not raising a due process claim. See Daly v. Sprague, 675 F.2d 716, 721 (1982), cert. denied, 460 U.S. 1047, 103 S.Ct. 1448, 75 L.Ed.2d 802 (1983)
 
 
 [2]
 The hospital in its brief does separately address the question of possible bias to the extent that Dr. Teresa Manax, the wife of Dr. Manax who was instrumental in initiating the suspension proceedings, was a member of the hearing panel appointed by the Board
 
 
 [3]
 The hospital has described its actions as follows:
 
 
 [1]
 On June 22, 1981, Plaintiff Davis' privileges were summarily suspended by the Chief of the Department of Surgery pursuant to Article VII, Sec. 1 of the Bylaws
 
 
 [2]
 On June 22, 1981, Defendants Manax and Shirey signed a letter detailing no less than 9 charges concerning the conduct of Plaintiff Davis, specifying 18 different cases of patient deaths or serious complications and advising Plaintiff Davis of the summary suspension
 
 
 [3]
 On June 26, 1981, the Executive Committee of the Medical Staff met and recommended that the summary suspension be revoked
 
 
 [4]
 On July 2, 1981, the Board of Trustees of Defendant Hospital recognized the revocation of such summary suspension and ordered that Plaintiff Davis be advised of same
 
 
 [5]
 On July 7, 1981, Defendant Hospital received the TMA [Texas Medical Association] Panel Report concerning the 18 specified cases, pursuant to Article VII, Sec. 1b of the Bylaws
 
 
 [6]
 On September 3, 1981, the Board advised the Executive Committee and Plaintiff Davis again of the specific charges against him
 
 
 [7]
 On September 22, 1981, the Board advised Plaintiff Davis of the scheduled September 29th meeting with the Executive Committee, again advised Dr. Davis of the charges against him, and advised that the medical records pertaining to such charges would be made available
 
 
 [8]
 On September 29, 1981, the Executive Committee met with Plaintiff Davis, after which it recommended that he be reprimanded but not suspended
 
 
 [9]
 On October 6, 1981, the Board overruled the Executive Committee and ordered a hearing for Plaintiff Davis before a specially appointed hearing panel, pursuant to Article VIII, Sec. 4b of the Staff Bylaws
 
 
 [10]
 On October 19, 1981, the Board advised Plaintiff Davis of the hearing before the hearing panel and again advised Dr. Davis of the specific charges
 
 
 [11]
 On November 4, 5, and 6, 1981, the hearing panel held a hearing on the charges brought against Dr. Davis. Plaintiff Davis called three doctors to testify on his behalf, and he himself also testified before the hearing panel
 
 
 [12]
 On November 6, 1981, the hearing panel voted to suspend the privileges of Dr. Davis
 
 
 [13]
 On November 16, 1981, the Board referred the matter to the Joint Conference Committee pursuant to Article VIII, Sec. 7a of the Staff Bylaws
 
 
 [14]
 On January 5, 1982, the Board issued a memorandum that the Joint Conference Committee was to meet on January 13, 1982, and that the transcript of the hearing would be available to members of the Joint Conference Committee for review prior to the meeting on January 13th
 
 
 [15]
 On January 16, 1982, the Joint Conference Committee, comprised of three doctors and three board members, voted 4 to 2 to suspend the privileges of Dr. Davis
 
 
 [16]
 On January 23, 1982, the Board suspended the privileges of Plaintiff Davis, which decision was final pursuant to Article VIII, Sec. 7a of the Medical Staff Bylaws
 Since Actions 1-4 involve only the summary suspension and its revocation, they are not part of the due process claim. However, the 18 cases of alleged improper patient treatment referred to in Action 2 provide the basis for Dr. Davis' permanent suspension as well. Dr. Davis, therefore, contends that he should have been notified of the TMA Panel's review of his patient records and allowed to appear before that panel before it made its recommendation to the hospital. Cf. Action 5, supra this note.
 The first meeting which Dr. Davis was invited to attend was the September 29 meeting of the Executive Committee where he presented evidence. This committee recommended only a reprimand for not including consultation notes in his records; future failure to do so would result in immediate termination. Cf. Action 8, supra this note. Dr. Davis strongly objects to the procedures followed at a subsequent closed meeting of the Board at which the Board did not listen to the tape-recorded evidence presented by Dr. Davis to the Executive Committee, but listened only to that portion of the tape containing the statements by Drs. Shirey, Smith and Eisma. Instead of accepting the recommendation of a reprimand, the Board appointed a special four member hearing panel composed of three laypersons and Dr. Teresa Manax. Cf. Action 9, supra this note.
 Dr. Davis participated in the hearing although he objected to the potential bias of Dr. Teresa Manax, the lack of time given him to review the patient records in order to prepare for the hearing, and not being informed of the specific charges against him, alleging that the charges in the June 22 summary suspension letter were "rather conclusory and vague." The panel recommended suspension. Cf. Actions 10, 11, and 12, supra this note.
 Dr. Davis also complains that he was not allowed to appear before the Joint Conference Committee when it met to consider the recommendation from the hearing panel and that this Committee reached its decision to suspend Dr. Davis without discussing the actual evidence presented to the hearing panel, only the fact that evidence had been presented. One member testified that he did not have a copy of the hearing record at the time, noting that the hearing went for 22 hours and the record was "thick." Cf. Actions 14 and 15, supra this note.
 
 
 [4]
 The statements in issue were those made by Drs. Shirey and Manax in the June 22 summary suspension letter
 
 
 [5]
 Dr. Davis does not cite to the record concerning this alleged evidence of malice. However, our examination of the record has revealed the following testimony by Dr. Smith describing the events after the summary suspension of Dr. Davis:
 We felt like there wasn't an imminent danger, this needed to be investigated, needed to go through the proper Bylaws procedure like are in the Bylaws with proper hearings. So Dr. Eisma and myself called an Executive Committee meeting. The Bylaws state 2/3 of the Executive Committee can call a meeting. So we called a meeting. We notified Dr. Shirey that we were calling the meeting and for June 26th at 6:00 P.M. in the Hospital Conference Room. Dr. Shirey met me before the meeting and stated that if we had the meeting that he would Summarily Suspend, or the Board would Summarily Suspend me and Dr. Eisma because we were out of order, and not only would they suspend us for disruptive action for having the meeting but that they would ignore what we did in the meeting. At that time I said I thought we were going by the Bylaws, and we were going to have the meeting, we duly called it, if he didn't want to come, that was his prerogative. So we did have the meeting and we voted at that time to lift....
 To lift the Summary Suspension and to continue with the investigation, to continue with the investigative process as set out in the Bylaws.
 Q [by Ms. McNamara, counsel for Dr. Davis] Did you anticipate there would be a review of the surgeries at the Hospital?
 A Yes.
 Q Of all surgeries?
 A Yes.
 Q Was such a review conducted?
 A To the best of my knowledge, no.
 Q Were you present at the Hospital on July 7, 1981?
 A Yes, ma'am.
 Q And were there three physicians there?
 A Yes, ma'am.
 Q Examining records?
 A Yes, ma'am.
 ....
 Q Did you have any discussion with Mr. Neely?
 A No. The doctors had asked me a question, I told them to refer to Mr. Neely.
 Q What was the question they asked you?
 A They asked over what length of time these records were obtained from, and I said I really didn't know.
 Q Did you know that the Committee was going to be reviewing only Dr. Davis' records?
 A No.
 Q Did you speak to Harvey Kelly that afternoon?
 A Yes.
 Q What was the nature of that conversation?
 A Mr. Kelly seemed quite upset that I was there. I told him I had merely come to thank the Committee for being there, I heard they were there and I thanked them for coming and started to leave when they asked me, you know, the length of time, and that is all I said. I was leaving when Mr. Harvey came in, when Mr. Kelly came in, I'm sorry.
 Q Thereafter, did Mr. Kelly contact you concerning the TMA Panel or the meeting?
 A Yeah. At the time basically he said he didn't know what I was doing there, but that I might be cited for disruptive action by merely coming and being there at all, and that he was quite upset that I was there.
 Q Did you discuss the review further with him?
 A Yes. He called me up at approximately 2:30 P.M. on July 10th, 1981 and he asked me not to refer any patients to Dr. Davis until the Board, Executive Committee could meet with the written findings that the ad hoc committee came up with.
 Q Did anyone else call you?
 A Yes. Mr. Bill Neely called me on July 13th, 1981, at approximately 8:30 P.M. He asked me to Summarily Suspend Dr. Davis, and read me a "verbatim" copy of what the Committee Report would say. He said that Dr. Davis had a patient in the Hospital, that we must not let him operate. I told him I would be happy to meet the Executive Committee when we got the full written report, but that I would not Summarily Suspend Dr. Davis. He told me he would therefore call the Board Meeting and have me Summarily Suspended for "disruptive action."
 
 
 [6]
 While Drs. Manax and Shirey may have been found liable for the summary suspension were it to present a due process claim, the proposed separate interrogatory on that issue was not submitted to the jury and the proposed instruction incorporating the summary suspension as a component of the procedural due process interrogatory that was submitted was not given. See note 1, supra. The hospital on appeal presented arguments that it was not liable for claims involving the actions of Drs. Manax and Shirey, but defended its liability for the procedural due process violation solely on the merits of that claim--in effect, conceding that it was solely liable