**CF & I STEEL CORPORATION, Appellant,**

v.

**PETE SUBLETT AND COMPANY and C. C. (Pete) Sublett, Appellees.**

**No. 17929.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

July 23, 1981.

Rehearing Denied Sept. 17, 1981.

Daniel H. Johnston, Jr., Robert R. Kamm, Ross, Banks, May, Cron & Cavin, Houston, for appellant.

Andrews, Kurth, Campbell & Jones, Carla Powers Dykes, William H. Tenison, Jr., Houston, for appellees.

Before COLEMAN, C. J., and PEDEN and WARREN, JJ.

COLEMAN, Chief Justice.

CF & I Steel Corporation (CF & I) sued Pete Sublett and Company on a series of notes and C.C. Sublett on a guaranty agreement. Both the Sublett Company and Mr. Sublett defended on the ground of duress. In addition Pete Sublett and Company filed a cross-action based on a theory that CF & I had unlawfully interfered with certain contracts and business relationships. The case was submitted to a jury and the jury's verdict was favorable to Pete Sublett and Company and C.C. Sublett. After the jury verdict was received the trial court permitted CF & I to file a trial amendment to conform the pleadings with the proof that Pete Sublett Company was indebted to CF & I in the amount of $218,183.72. The court then entered judgment that CF & I take nothing, and that the appellees recover judgment against CF & I in the amount of $68,255.71. The jury found actual and exemplary damages in the amount of $350,-000. Judgment was entered for the difference between the damages awarded by the jury and the amount of the debt which the court found was established by the undisputed testimony.

CF & I manufactures oil field pipe. Pete Sublett and Company was in the business of selling oil field pipe and had the status of a distributor for CF & I. Pete Sublett and Company was one of seventeen or eighteen distributors for CF & I and was also a distributor for Armco Steel. The relationship with CF & I had been in existence over a long period of time and had been quite satisfactory to both parties prior to the events giving rise to this lawsuit.

The relationship between the mill and the distributor, though of considerable econom-ic importance was not evidenced by a written contract. The Sublett Company would purchase pipe from CF & I both for its own inventory and to fill specific customer orders. In both cases CF & I would collect from Sublett. The mill would make sales solely on the credit worthiness of the distributor and did not collect from the consumer.

The year 1975 had been a period of high demand for oil field pipe, and CF & I had placed its distributors under a quota system, whereby they could order a limited quantity of pipe to be manufactured in the future. The Sublett Company ordered a quantity of pipe in July of 1975, to be delivered no later than the week of December 31, 1975. The consumer demand for pipe was drastically curtailed in January and subsequent months of 1976. The pipe ordered by Sublett and Company was not delivered in 1975 and the Sublett Company attempted to cancel the order. The pipe was delivered in late February of 1976, and the Sublett Company was billed for $313,-000, which it was unable to pay. Prior to this time the Sublett Company had been paying its accounts early and did not owe for any past shipments. During the remainder of 1976, the Sublett Company ran a delinquent balance of approximately $300,000 and suffered a cash shortage, which Sublett Company claimed resulted from CF & I's refusal to cancel the order.

During November of 1976, CF & I became insistent that arrangements be made to liquidate the past-due account. After telephone negotiations it was decided that Sublett and Company would execute a series of notes and that Mr. Sublett would execute a personal guaranty as to existing and future debts of the company.

At a meeting between Mr. Stover, credit manager for CF & I, Mr. Sublett, and Mr. Livesay, the treasurer of Pete Sublett and Company, Mr. Stover demanded that Mr. Sublett execute the guaranty agreement previously discussed and that the indebtedness be paid off by the execution of a series of three notes payable in thirty, sixty, and

ninety days. There is evidence that Mr. Stover represented that this was the only terms of payment which the board of directors had authorized and that if a mutual agreement on payment of the indebtedness was not reached the distributorship would be cancelled and suit for collection of the amount due would be filed. After further discussion Mr. Stover agreed to ask the board of directors to approve a pay-out by a series of six equal notes payable one each month. Mr. Stover was able to get the six-note series accepted by his company. It was also agreed that the future sale of pipe on credit to Pete Sublett and Company would be handled on an order-by-order basis.

Pete Sublett and Company thereafter continued to do business with CF & I and paid two of the six notes within a few days after their due date. Default was made in the payment of the third note. After a meeting in July of 1977, the distributorship was cancelled. This suit was filed after the due date of the last of the six notes.

The appellants assert that the guaranty agreement and the series of notes were executed under duress. This affirmative defense was submitted to the jury by special issue no. 2. This issue inquired: "Do you find from a preponderance of the evidence that any of the following agreements were validly entered into by and between the parties hereto." Thereafter followed in separate paragraphs spaces for "yes" or "no" answers for each of the remaining promissory notes and the personal guaranty agreement. In each instance the jury answered "no."

■ In connection with this issue an instruction in the following language was given:

> You are instructed in answering Special Issue No. 2 that a contract which is entered into as a result of duress is not validly entered into. The term "duress" means that degree of constraint, whether actually inflicted or threatened or impending which is sufficient in severity or in apprehension, to overcome the mind of the person to whom such constraint is

directed. It consists of no precise act or form, but it's (sic) essence is that it so effected the mind as to overcome the free will of the person affected, so that the instrument executed was not in truth what it would have been but for the constraint.

The appellant objected to the form of the issue on the ground that it placed the burden of proof on the plaintiff when the burden should have been placed on the defendant to prove its affirmative defense. The issue as submitted requires the plaintiff to secure a finding of fact that the notes were valid. There is no dispute but that the notes were executed by the payor and supported by consideration. The notes were admitted into evidence without objection. The trial court erred in overruling this objection made by CF & I Steel to special issue no. 2. The issue should be so framed as to definitely place the burden upon the party pleading the affirmative of the question included in the special issue. *Traders & General Ins. Co. v. Jenkins*, 135 Tex. 232, 141 S.W.2d 312 (1940); *Lemons v. Davis*, 306 S.W.2d 224 (Tex.Civ.App.—Fort Worth 1957, writ ref'd n. r. e.).

■ The appellant also contends that there was no evidence requiring the submission of special issue no. 2. What constitutes duress is a question of law, but whether the facts exist to establish the elements of duress may be an issue of fact. The courts of Texas have consistently followed the rule that, as a matter of law, (1) there can be no duress unless there is a threat to do some act which the party threatening has no legal right to do; (2) there must be some illegal exaction or some fault or deception; (3) the restraint must t e imminent and such as to destroy free agency without the present means of protection. *Tower Contracting Co., Inc. of Texas v. Burden Brothers, Inc.*, 482 S.W.2d 330 (Tex.Civ.App.—Dallas 1972, writ ref'd n. r. e.). There is no evidence that CF & I was guilty of fraud or deception or that it had no legal right to take the actions threatened. Under the evidence CF & I was entitled to terminate the distributorship at will. Pete Sublett

and Company does not argue that the money represented by the series of notes was not due and payable at the time the notes were executed. The evidence is not sufficient to raise an issue on duress. *Dale v. Simon*, 267 S.W. 467 (Tex.Comm'n App. 1924, jdgmt. adopted).

The jury found that a contract or contracts for the sale of pipe existed between Mitchell Energy Company, through its subsidiary Butler Drilling Company, and Pete Sublett and Company from approximately February 18, 1977, until May 11, 1977; that CF & I knew that the contract or contracts were in existence; that CF & I intentionally and willfully interfered with the contract or contracts; that CF & I was not justified in such interference; that CF & I's conduct in interfering with the contract or contracts was the proximate cause of the cancellation of the order or orders between Mitchell Energy Company, through its subsidiary Butler Drilling Company, and Pete Sublett and Company; and that $150,000 would fairly and reasonably compensate Pete Sublett and Company for its injuries which resulted from the occurrence in question.

The court instructed the jury that "justified" means one is privileged to interfere with contracts between others when they do so in bona fide exercise of their own rights or when they possess an equal or superior interest to that of the other party in the subject matter.

■ A case of wrongful interference with a contract is established by findings that a defendant willfully and intentionally committed acts calculated to cause damage to the plaintiffs' lawful business when the acts were done with the unlawful purpose of causing damage and loss, without right or justifiable excuse on the part of the defendant, which result in actual damage and loss to the plaintiff. *Armendariz v. Mora*, 553 S.W.2d 400 (Tex.Civ.App.—El Paso 1977, writ ref'd n. r. e.); *Tidal Western Oil Corporation v. Shackelford*, 297 S.W. 279 (Tex.Civ.App.—Fort Worth 1927, writ ref'd).

CF & I asserts that there is no evidence as to acts of interference by CF & I direct-

ed to the Sublett Company's contract with Butler Drilling Company. CF & I also objected to the court's charge for the reason that it failed to include a special issue asking the jury to find whether or not the plaintiff interfered with the contracts in question, and because the issues submitted assumed an essential element of the cause of action when there were factual disputes.

There is evidence that in February of 1977, Mitchell Energy Company, through its subsidiary, Butler Drilling, placed a large order with the Sublett Company. A written acceptance dated March 2, 1977, shows that the terms were 2–10–30. There is testimony that this meant that the distributor had thirty days in which to pay, but if the amount due was paid within ten days a 2% discount is given. This confirmation instrument reflects that pipe was sold to Pete Sublett and Company to be shipped to Butler Drilling Company at a particular location. There is also an invoice from CF & I for the first shipment of this order in the amount of $228,081.72. There is a notation on the invoice that a cash discount of $4,624.75 will be allowed if paid by April 1, 1977, net 30 days. When the pipe was finished and ready for shipment, however, CF & I notified Sublett that payment in cash would be required before the pipe could be shipped to Butler. Mr. Sublett testified that at the time he executed the notes to CF & I for the purpose of bringing his delinquent account into a current status, he understood that until the notes were fully paid credit would be handled on a specially arranged basis and would not necessarily be on an open account as it had been in the past. He testified that the credit terms applicable to the Butler Drilling order were negotiated by Mr. Stover of CF & I and Mr. Livesay for his company. Mr. Livesay did not testify concerning these credit negotiations. However, Mr. Jorgensen, a sales representative for the Sublett Company, did testify over an objection that his testimony was based on what he had been told rather than from his personal knowledge. The trial court overruled the objection and instructed the jury:

Ladies and Gentlemen, whatever was told to Mr. Jorgensen is being admitted to you not for the truth of the matter asserted by CF & I, but it was what this gentleman learned. It is being submitted to you, this is what was communicated to him. With that limitation I will let him testify.

Mr. Jorgensen then testified that CF & I would not ship the pipe to Pete Sublett Company or Butler Drilling Company "without cash." The order had not been placed as a cash order. Nevertheless Pete Sublett and Company paid cash and the order was shipped.

Mr. Stover testified that there were two separate orders placed with CF & I by the Sublett Company for delivery to Mitchell Energy Company. He stated that the first order was ultimately handled on a cash advance basis as determined by Mr. Livesay and that the second order did not "materialize." He testified that he had no agreement with Mr. Livesay or any one else at the Sublett Company after January of 1977 to sell to them on credit or open account or any other basis.

Mr. Jorgensen, the sales representative, testified that when the second Mitchell order was ready for shipment CF & I demanded payment in cash before shipment. He stated that the payment terms agreed to were 2, 10, net 30. On cross-examination, however, he stated that he did not know what the situation was regarding the credit restrictions on the Sublett account in 1976. He identified an invoice submitted by CF & I to the Sublett Company for this second order as being a "pro forma" invoice. He stated that a pro forma invoice lays out in rough terms what a future invoice will be. He said that he had nothing to do with the negotiations of the credit terms and that his statement that there had been an agreement to sell on credit was based on his understanding, probably from the sales coordinator and the credit manager of the Sublett Company.

Mr. Jorgensen testified that the Sublett Company was unable to raise sufficient funds to pay cash for the second order and

that it was necessary for him to convey this information to the Mitchell Company. Mitchell was disturbed by Jorgensen's request that it pay cash in advance to Sublett and refused to do so. Another of CF & I's distributors had originally bid on the order, and when the Sublett Company was unable to deliver the pipe, CF & I sold to this other company for delivery to Mitchell.

CF & I filed a motion to disregard the jury's answers to special issues no. 5, 5a, and 6. Special issues no. 5 and 6 required a finding on the part of the jury that CF & I Steel had engaged in conduct which interfered with the contract between Pete Sublett and Company and Mitchell Energy Company with reference to the sale of pipe. The testimony establishes that Mitchell Energy terminated the contract with the Sublett Company when it was asked to pay for the pipe in advance.

There is no evidence that CF & I had any direct contact with Mitchell Energy or Butler Drilling Company prior to the cancellation of the order. There is no evidence of conduct on the part of CF & I which interfered with the contract between Pete Sublett and Company and Butler Drilling Company. There is no evidence of probative force that CF & I agreed with the Sublett Company to sell it the pipe listed in the second invoice on credit. There is no evidence that CF & I had agreed to sell the pipe listed on that invoice to Mitchell Energy through a different distributor prior to the time that Mitchell terminated its agreement with the Sublett Company.

■ A tortious interference with a contract entails intentional and willful acts calculated to cause damage and with the unlawful purpose of causing damage to the contracting parties without just or lawful right. *South Central Livestock Dealers, Inc. v. Security State Bank of Hedley, Texas,* 551 F.2d 1346 (5th Cir. 1977).

■ In the absence of any evidence of conduct on the part of CF & I which could constitute "interference" with a contract as that term is known in law, the trial court should have sustained the motion to disregard the answers to special issues 5 and 6.

Special issue no. 5a inquired whether the jury found from a preponderance of the evidence that CF & I was not justified in "such interference." CF & I refused credit to the Sublett Company in the bona fide exercise of its own rights in the transaction. No interference was established. The answer to issue 5a should have been disregarded.

Once the answers to special issues no. 5, 5a, and 6 are disregarded, there is no basis in the verdict of the jury to sustain a judgment against CF & I Steel in favor of Pete Sublett and Company based upon the cause of action asserted in connection with the contract for the sale of pipe to Butler Drilling Company.

Sublett also secured favorable findings from the jury that there was a reasonable probability that Pete Sublett and Company would have entered into a contractual relationship with Getty Oil Company for the sale of pipe; that CF & I acted maliciously in preventing the relationship from occurring with the purpose of harming Pete Sublett and Company; that CF & I was not justified in such interference; and a damage finding. The jury also answered favorably to Pete Sublett and Company a series of issues in similar language inquiring as to its probable relationship with Cities Service Oil Company.

■ Interference with a business relationship is similar to the tort of contract interference. It is not necessary to establish the existence of a valid contract, but the interference with a general business relationship is actionable only if the defendant's interference is proven to be motivated by malice. *Morris v. Jordan Financial Corporation*, 564 S.W.2d 180 (Tex.Civ.App.— Tyler 1978, writ ref'd n. r. e.).

The only witnesses testifying favorably for Pete Sublett and Company on the issue of acts of interference by CF & I to induce customers to avoid future contracts with the two companies were Mr. Jorgensen, the salesman, and Mr. Sublett, the president. They testified to hearing reports from unnamed employees of Getty and Cities Service that unnamed employees of CF & I had advised them that orders could not be filled through Pete Sublett and Company because of credit problems.

Mr. Jorgensen testified that Pete Sublett and Company placed an order with CF & I for delivery to Getty Oil in March or April of 1977. He testified that the order was accepted by CF & I but that about one month later Getty Oil suddenly cancelled the order. He then testified that he was "privy" to information received by the salesmen for Pete Sublett and Company and that they were told by employees of Getty Oil Company that Getty had been visited by CF & I and were told that they could not place any business on CF & I's mill through Pete Sublett and Company. This testimony was objected to on the ground that it was hearsay. The trial court admitted the testimony and instructed the jury that the testimony was not being introduced for the truth of the matter asserted, but that it was the information "this gentleman received from Getty." The court then overruled an objection that the testimony was immaterial. Jorgensen also testified that in 1979 he personally called on the purchasing agent at Getty Oil Company trying to re-establish Pete Sublett and Company as one of their sources of supply. He stated that the purchasing agent told him that he was wasting his time and that Getty would not do business with Pete Sublett and Company "until we got the problems of the past taken care of and he referred directly to the fact that we had let them down on the order before."

Mr. Jorgensen testified that prior to 1977 Pete Sublett and Company had a very good relationship with Cities Service Oil Company; that it purchased pipe directly from Pete Sublett and Company on a regular basis and placed mill tonnage on CF & I's mill through Pete Sublett and Company. He testified that Cities Service no longer does business with Pete Sublett and Company as a result of its inability to perform on mill shipments of casing coming from CF & I.

Mr. Sublett testified that his relationship with Getty Oil Company was destroyed in

1977. He stated that Curtis Cooper, a CF & I representative, told "us" that he had gone to the Getty Oil Company and advised them that due to credit problems Pete Sublett and Company could not handle their CF & I business. This testimony was received over the defendant's objection with the instruction: "Same instruction, ladies and gentlemen, what was told to him you can receive that, but it is not to be used against the plaintiff in the case."

Again, over a hearsay objection, Mr. Sublett was permitted to testify that Cities Service had attempted to place a substantial order for some CF & I tonnage through Pete Sublett and Company and were advised that the order could not be accepted because of the credit condition of Pete Sublett and Company.

In view of the trial court's limiting instruction on this testimony there is no evidence of probative force to support the answers made by the jury to the liability issues submitted by the court with reference to Getty Oil Company and Cities Service Oil Company. In addition the testimony is hearsay and lacks probative force. *White v. White*, 590 S.W.2d 587 (Tex.Civ. App.Houston [1st Dist.] 1979, no writ). The testimony of Mr. Sublett concerning the testimony made "to us" by Mr. Cooper is not admissible as an exception to the hearsay rule unless it is shown that Cooper had the authority to make the communication on the specific subject involved. This proof is lacking. *Big Mack Trucking Company, Inc. v. Dickerson*, 497 S.W.2d 283 (Tex. 1973).

The trial court erred in denying the motion of CF & I Steel Company for judgment *non obstante veredicto*. The judgment is reversed and the cause is remanded to the trial court with instructions to enter a judgment in favor of CF & I Steel Corporation and against Pete Sublett and Company and Pete Sublett, jointly and severally, for the amount of the four notes described in special issue no. 2 together with accrued interest and the attorney's fees as found by the jury in special issue no. 1. The judgment will also award interest as authorized by law and assess court costs against the defendants.