United States Court of Appeal,
Fifth Circuit.

No. 93-8609.

Terry THRIFT, Jr., Plaintiff-Counter Defendant-Appellant Cross-Appellee,

v.

Sandra HUBBARD, as Independent Administratrix of the Estate of Victor Mark Hubbard, Deceased, et al., Defendants-Counter Plaintiffs-Appellees Cross-Appellants,

v.

EMIS SOFTWARE, INC., Counter Defendant-Appellant, Cross-Appellee.

Feb. 15, 1995.

Appeal from the United States District Court for the Western District of Texas.

Before SMITH and EMILIO M. GARZA, Circuit Judges, and STAGG, District Judge.[*]

EMILIO M. GARZA, Circuit Judge:

This appeal arises out of a suit over soured business dealings among the various parties involved. Terry Thrift, Jr., and EMIS Software appeal the district court's judgment on issues of alter ego and the sufficiency of the pleadings. The Estate of Victor Hubbard and Sandra Hubbard ("the Hubbards") and Peerless Technologies Corporation ("Peerless") cross-appeal the district court's judgment, alleging errors on issues of prejudgment interest, usury, and contract ambiguity. We affirm in part, reverse in part, and remand.

**I**

---

[*]District Judge of the Western District of Louisiana, sitting by designation.

The Hubbards formed Peerless as a spinoff of the software division of a company called PECO.[1] Under the agreement between Peerless and PECO, Peerless received ownership rights to the division's software and other fixed assets, but PECO retained a reversionary interest in the software and fixed assets. Peerless also agreed to pay royalties to PECO on sales of the software. One of the software packages that PECO transferred to Peerless was called EMIS, then version 1.0. After its formation, Peerless continued to develop EMIS, eventually developing versions 1.1 and 1.2.

Thrift became involved with Peerless when he purchased stock in the company. He later agreed to fund a revolving-credit loan to Peerless, and he and Peerless entered into a Revolving Credit Note and Security Agreement to that effect. Thrift received certain rights to various Peerless assets under the Agreement, and the Hubbards pledged one-half of their Peerless stock as additional security. Peerless defaulted on the note, and Thrift sent the Hubbards a notice of default and demanded payment. The pledged stock was transferred to Thrift, after which the parties negotiated a second Revolving Credit Note.

Thrift also agreed to fund Peerless' buyout of PECO's reversionary interest in Peerless. The Assignment and Option Agreement executed for that purpose assigned rights in various fixed assets to Thrift, with Peerless to lease those assets from

---

[1]Victor Hubbard was the sole director and president of Peerless. Sandra Hubbard was also an officer.

Thrift in exchange for royalty payments. Thrift gave Victor Hubbard a check for $100,000 to fund the buyout, and Hubbard deposited the funds in a Peerless account. Before the buyout was executed, the IRS seized $87,122.85 from the Peerless account for unpaid employment taxes. Peerless refunded the difference ($12,877.15) to Thrift and executed a note to Thrift for the seized funds. Thrift then agreed to finance the buyout once more, but he made payment directly to PECO and paid only $75,000.

Thrift also made a short-term loan of $17,981 to Peerless. Under the terms of the loan, accounts receivable should have provided the basis for repayment, but no repayment ever occurred.

The Hubbards shortly thereafter formed a new company, GP Services, to act as a reseller of software for Peerless. They also moved some of Peerless' assets to their new GP Services offices. Thrift eventually visited the Peerless offices and discovered the Hubbards' actions. Bill Schaeffer, Peerless' Chief Operating Officer, agreed to change the locks on the Peerless offices to prevent further removal of assets.

Thrift then sent the Hubbards a notice of default on the revolving credit notes and demanded payment. He also demanded payment of past-due royalties and the $17,981 short-term loan. Peerless assigned accounts receivable to Thrift due to the unpaid debts, and Thrift returned all his Peerless stock to Peerless.

Thrift later formed his own company, EMIS Software, Inc., and EMIS Software and GP Services signed a Major Account Reseller Agreement ("MAR") under which EMIS Software licensed GP Services to

3

resell EMIS program packages. Thrift later cancelled the MAR pursuant to its terms. After various contacts between EMIS Software representatives, including Thrift, and various customers of GP Services, some of the customers withdrew from dealings with GP Services.

Thrift ultimately sued the Hubbards and Peerless,[2] alleging breach of contract, fraud, and violations of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), in connection with the Hubbards' and Peerless' nonpayment of funds due and owing under the two Revolving Credit Notes, the funds advanced and royalties due under the Assignment and Option Agreement, and the funds lent under the $17,981 short-term arrangement. Thrift also sought declaratory relief regarding rights in all versions of EMIS.

The Hubbards and Peerless responded with counterclaims against Thrift and EMIS Software, Inc., alleging copyright infringement, misappropriation of trade secrets, usury, conversion, and breach of fiduciary duty. Peerless also sought injunctive relief concerning the use of EMIS versions 1.1 and 1.2. Lastly, the Hubbards alleged that Thrift and EMIS Software, Inc. had interfered with contractual relations, defamed the Hubbards, and intentionally inflicted emotional distress on them.

By agreement, the parties tried the case before a magistrate judge. After denying the Hubbards' and Peerless' motion for judgment as a matter of law, the magistrate judge submitted the

---

[2]Thrift sued the Hubbards and Peerless both individually and under an alter-ego theory.

4

case to a jury that decided as follows:

1. Thrift received ownership of all versions of EMIS under the Assignment and Option Agreement.

2. The Hubbards and Peerless committed fraud against Thrift.

3. Peerless was the alter ego of the Hubbards.

4. Thrift interfered with both existing and prospective contractual relations of the Hubbards, and EMIS Software interfered with the Hubbards' prospective contractual relations.

5. Thrift intentionally inflicted emotional distress on the Hubbards.

6. The stock transfer to Thrift after Peerless' default on the first Revolving Credit Note constituted a foreclosure and satisfaction of the debt under that note.

The jury awarded varying amounts of damages on the parties' successful claims, and the magistrate judge awarded prejudgment interest on certain claims.  The magistrate judge overruled each party's postjudgment motions.  Thrift, EMIS Software, the Hubbards, and Peerless all appeal the judgment on various grounds.

## II

### A

Thrift argues first that the Hubbards should be held individually liable for the unremitted funds from the $100,000 transaction because the jury found that Peerless was the alter ego of the Hubbards.  The trial court applied the alter ego doctrine to only the $17,981 loan.

The liability of a shareholder for contractual debts of a corporation is limited by statute.

> A holder of shares ... shall be under no obligation to the corporation or to its obligees with respect to ... (2) any contractual obligation of the corporation on the basis that the holder, owner, or subscriber is or was the alter ego of

5

> the corporation, ... unless the obligee demonstrates that the holder, owner or subscriber caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, or subscriber....

Tex.Bus.Corp. Act Ann. art. 2.21(A) (West Supp.1995). The alter ego doctrine provides one way by which an obligee can pierce the corporate veil to reach a shareholder's assets. *Western Horizontal Drilling, Inc. v. Jonnet Energy Corp.,* 11 F.3d 65, 68 (5th Cir.1994); *Fidelity & Deposit Co. v. Commercial Cas. Consultants, Inc.,* 976 F.2d 272, 274 (5th Cir.1992) (commenting that alter ego is one form of corporate disregard under Texas law); *see also Coastal Shutters & Insulation, Inc. v. Derr,* 809 S.W.2d 916, 921 (Tex.App.—Houston [14th Dist.] 1991, no writ) ("Alter ego applies when there is such unity or a blurring of identity between two corporations or a corporation and an individual that the separateness of the single corporation has ceased and holding only the corporation liable would cause injustice.").[3] Proving that a corporation is the alter ego of a shareholder alone is not enough; in order to pierce the corporate veil, the obligee must also demonstrate fraud by and direct personal benefit to the obligor. *See Atlantic Richfield Co. v. Long Trusts,* 860 S.W.2d 439, 446 (Tex.App.—Texarkana 1993, writ denied) ("[W]hen actual fraud for

---

[3]*See also Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 228 (Tex.1990) ("An alter ego relationship may be shown from the *total* dealings of the corporation and the individual."); *Mancorp, Inc. v. Culpepper,* 836 S.W.2d 844, 846 (Tex.App.—Houston [1st Dist.] 1992, no writ) ("The "injustice' to be avoided in alter ego cases is that of leaving the plaintiff with an uncollectible judgment against the corporation, while allowing its alter ego to go free.").

the benefit of the perpetrating shareholder can be shown, the various doctrines of disregarding the corporate entity, including alter ego and a sham to perpetrate a fraud, are still very much alive."); *Farr v. Sun World Sav. Ass'n,* 810 S.W.2d 294, 296 (Tex.App.—El Paso 1991, no writ) ("Carefully preserved, however, is the right of a person to go behind the corporate entity in order to establish individual shareholder liability by a showing of actual or common law fraud.").

The Hubbards contend that Thrift failed to satisfy the fraud element of article 2.21 for the $100,000 transaction.[4] We agree. Special Interrogatory # 21 asked whether the Hubbards had committed fraud in either the $100,000 or the $17,981 transaction,[5] and

---

[4]Because the dispositive issue is whether Thrift satisfied the elements of the statute, the parties' arguments regarding the present status of *Castleberry v. Branscum,* 721 S.W.2d 270 (Tex.1986), do not bear on the resolution of this question.

[5]Special Interrogatory 21 stated as follows:

> Did Peerless or Victor Hubbard or Sandra Hubbard commit fraud in the transactions involving the $100,000 advanced by Thrift in December, 1986 or the $17,981 advanced in February, 1987?

> The burden of proof for this question is upon the plaintiff.

> ANSWER:  "YES" or "NO" for each of the following:

> Peerless:

> Victor Hubbard:

> Sandra Hubbard:

> INSTRUCTIONS

> "Fraud" consists of the following elements:

7

Special Interrogatory # 22 asked what compensation would be appropriate.[6] The jury answered "Yes" in all three spaces in question 21, but only awarded compensation in question 22 against Peerless for fraud in connection with the $17,981 transaction. The jury therefore found that the Hubbards did not commit fraud in the $100,000 transaction.[7]

---

(1) a material representation was made;

(2) the representation was false;

(3) when the speaker made the representation he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion;

(4) the speaker made the representation with intent that it should be acted upon by Terry Thrift;

(5) Terry Thrift acted in reliance upon the representation;

(6) Terry Thrift thereby suffered injury.

[6]Special Interrogatory # 22 stated as follows:

What amount of money, if any, would fairly and reasonably compensate Terry Thrift for the damage, if any, suffered by him as a result of the fraud you have found in the preceding special question?

The burden of proof for this question is upon the plaintiff.

ANSWER IN DOLLARS AND CENTS ONLY FOR THE FOLLOWING FOR WHOM YOU ANSWERED "YES" IN Question No. 21.

Peerless:

Victor Hubbard:

Sandra Hubbard:

[7]The district court instructed the jury that damage is an element of fraud.

Thrift argues that question # 21 queried only about fraud through misrepresentations and that he had sufficiently proved fraud in the $100,000 transaction in other ways; therefore, he asks that we limit the jury's finding of no fraud with respect to the $100,000 transaction to misrepresentations. Interrogatory # 21, however, did not ask if the Hubbards had committed fraud through misrepresentations; it asked if they had committed fraud. The misrepresentations only impacted the definition of fraud. Thrift had the burden of proving fraud, and if he believed that fraud encompassed more than the definition provided in the instruction, he should have requested an instruction to that effect and objected to its absence. Thrift, however, did not object to the instruction's definition of fraud, and he is now bound by the jury's finding.[8]

Nonetheless, Thrift argues that, notwithstanding the jury's finding, the district court should have found that fraud generally committed by the Hubbards satisfied the actual fraud component of article 2.21. We disagree. The liability imposed under article 2.21 concerns "shareholder liability for *acts of the corporation in*

---

[8]*See* Fed.R.Civ.P. 51 ("No party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."); *McDaniel v. Anheuser-Busch, Inc.,* 987 F.2d 298, 306 (5th Cir.1993) ("A party has the burden to request the submission of its issues to the jury and to request instructions on each such issue.... [F]ailure to object to the wording of a special issue prevents a party from objecting to such wording on appeal."); *Pan Eastern Exploration Co. v. Hufo Oils,* 855 F.2d 1106, 1123 (5th Cir.1988) ("A party must ordinarily object precisely to the wording of jury instructions and interrogatories....").

*connection with contract claims," Farr,* 810 S.W.2d at 296 (emphasis added), and requires a showing of actual fraud in those acts, *see, e.g., Atlantic Richfield Co.,* 860 S.W.2d at 446 (imposing liability where fraud was in those transactions at issue in case); *Farr,* 810 S.W.2d at 297 (describing evidence relevant to fraud determination, all of which evidence related to transaction at issue). The jury found fraud only in relation to the $17,981 claim, and it found no fraud in relation to the $100,000 claim. Accordingly, the Hubbards' fraudulent conduct was not "in connection with" the $100,000 debt, and article 2.21 prevents individual liability of the Hubbards for that debt.

The Hubbards also challenge the trial court's decision on the alter ego issues. They contend that they should not be held personally liable for the $17,981 transaction because Thrift failed to prove that they received any direct personal benefit. The evidence showed, however, that the funds that Peerless should have used to repay Thrift were instead used, among other purposes, by the Hubbards to make payments on the lease for the Peerless offices. The payments directly benefited the Hubbards because Victor Hubbard held the lease in his own name. These facts supported the jury's finding of alter ego. Therefore, the trial court correctly used the jury's finding of alter ego to hold the Hubbards individually liable for the $17,981 debt. *See* Tex.Bus.Corp. Act Ann. art. 2.21(A) (West Supp.1995) (allowing imposition of individual liability under alter ego theory where fraud and direct personal benefit have been shown).

10

Thrift contends next that the Hubbards should not recover for interference with prospective business relations and that the district court erred in instructing the jury on the issue because the Hubbards failed to plead that cause of action.  A court may instruct the jury on an issue only if the issue has been properly tried by the parties.  *Neubauer v. City of McAllen,* 766 F.2d 1567, 1575 (5th Cir.1985) (holding that failure to try issue made instruction on that issue reversible error).  "The trial court has no duty to give the jury an exegesis of legal principles that might enable a plaintiff to recover or to instruct the jury on issues not fairly raised by the pleadings, the pretrial order, or the course of the trial."  *Laird v. Shell Oil Co.,* 770 F.2d 508, 510 (5th Cir.1985).

The issue of interference with prospective business relations was not tried by implied consent.  The trial record contains numerous objections, both individual and continuing, to the admission of evidence of Thrift's interfering conduct for the purpose of proving interference with prospective relations.  Moreover, even without objections, the admission of this evidence does not result in trial by implied consent because the evidence was also relevant to the issue of interference with existing contracts.[9]  Accordingly, we look to the pleadings and the pretrial

---

[9]*See Quillen v. International Playtex, Inc.,* 789 F.2d 1041, 1043-44 (4th Cir.1986) (refusing to hold that defendant had impliedly consented where evidence presented went to pleaded issue primarily;  therefore, "the defendant would have been caught unaware" of the new issue);  *Trinity Carton Co. v.*

order to determine if the Hubbards properly raised the issue. The Hubbards respond that even if their pleadings were defective, the Hubbards' proper inclusion of the issue in the pretrial order superseded the pleadings and made the issue available for trial.[10] Thrift, however, contested the issue in the pretrial order, arguing defective pleadings.[11] Although the magistrate judge never ruled

_____

*Falstaff Brewing Corp.,* 767 F.2d 184, 192 (5th Cir.1985) (holding that trial by consent "requires that the parties actually recognize the issue to have been litigated"), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986); *id.* at 193 ("Trial by consent may not be deemed where evidence concerning the issue that is maintained to have been thusly tried is also relevant to other issues that in fact have been pleaded and tried, at least in the absence of clear notice that such issue was being raised.").

[10]*See Branch-Hines v. Hebert,* 939 F.2d 1311, 1319 (5th Cir.1991) ("It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial...."); *Hall v. State Farm Fire & Cas. Co.,* 937 F.2d 210, 212 (5th Cir.1991) ("Once entered, a pretrial order governs the trial."); *Flannery v. Carroll,* 676 F.2d 126, 129 (5th Cir.1982) ("The claims, issues, and evidence are limited by the [pretrial] order and the course of the trial is thereby narrowed to expedite the proceeding.").

[11]The issue regarding tortious interference contained Thrift's reservation: "Plaintiff/counter-defendants contend any such question should be limited to defendants' pleadings which do not allege interference with business relations and do not mention Grammco/Andrews."

> The relevant portion of the Hubbards' pleadings is as follows:
>
> B. Interference with Contractual Relationships
>
> 1. Thrift intentionally and willfully induced TFC, Inc. to breach and violate the provisions of a contract between TFC, Inc. of Minnesota and the Hubbards d/b/a GP Services. Such contract called for the delivery of hardware and software and services to TFC, Inc. for the approximate amount of $37,000.00. Thrift falsely represented to TFC, Inc. that the Hubbards had no right

12

on this objection, he implicitly overruled the objection by admitting the evidence of Thrift's interfering conduct during the

---

to sell the software in question and made other false representations. Such inducement by Thrift was without legal excuse or other justification and has resulted in Thrift wrongfully damaging the Hubbards by depriving them of profits which they otherwise would have received under the contract.

2. Thrift intentionally and willfully induced two other customers of the Hubbards. Sunbelt Transformers and Laventhol & Horwath to breach agreements with the Hubbards, d/b/a GP Services, and to cancel orders for hardware and software and services. Thrift, either individually or by and through authorized agen[ ]ts, falsely represented to said companies that the Hubbards had no right to sell the software in question and made other false representations. Such inducements by Thrift were without legal excuse or other justification and have resulted in Thrift wrongfully damaging the Hubbards by wrongfully depriving them of profits which they otherwise would have received under the contracts.

3. Thrift, by and through authorized agents, has sent letters to all of the customers of the Hubbards d/b/a GP Services for the purpose of inducing said [sic] customers to cancel their dealings with the Hubbards and to instead deal with Thrift's new corporation, EMIS SOFTWARE, Inc. Such letters falsely represented that the Hubbards had no right to sell the software which they were selling and made other false representations. Such letters were sent without legal excuse or other justification and have resulted in losses of sales, referral, and reputation suffered by the Hubbards.

4. Thrift acted with malicious intent in all instances set out above in that he persuaded the contracting parties to breach their contracts out of spite and ill-will towards the Hubbards and for the sole purpose of causing economic injury to the Hubbards, and because they refused to cooperate with Thrift's plan to defraud the creditors of Peerless. The Hubbards seek exemplary damages far in excess of the Court's minimum jurisdictional amount.

13

trial.[12]

We review a trial court's interpretation of a pretrial order only for abuse of discretion. *Hall,* 937 F.2d at 212; *Flannery,* 676 F.2d at 129. Under the Federal Rules of Civil Procedure, a pleading, or pretrial order, need not specify in exact detail every possible theory of recovery—it must only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957).[13] Accordingly, the Hubbards satisfied the Rule 8 requirement if they gave notice of both causes of action.[14]

Texas law recognizes a cause of action for either

_____

[12]Moreover, because the issue was raised in the pretrial order, even if objected to, Thrift cannot, and indeed did not, argue that admission of evidence on this issue caused any surprise.

[13]*See also* Fed.R.Civ.P. 8(a) (requiring only "a short and plain statement"), 8(e) ("Each averment of a pleading shall be simple, concise, and direct."); *Colle v. Brazos County, Tex.,* 981 F.2d 237, 243 (5th Cir.1993) ("A plaintiff's complaint ordinarily need only be a short and plain statement that gives the defendant notice of what the claim is and the grounds upon which it rests."); *Perkins v. Silverstein,* 939 F.2d 463, 467 (7th Cir.1991) (requiring plaintiffs to "identify the grounds upon which their claims are based ... even under the liberal notice pleading" (footnote omitted)); *Bechtel v. Robinson,* 886 F.2d 644, 650 n. 9 (3d Cir.1989) ("[A]s long as the issue is pled, a party does not have to state the exact theory of relief in order to obtain a remedy.").

[14]*See Torres Ramirez v. Bermudez Garcia,* 898 F.2d 224, 226-27 (1st Cir.1990) (holding that, if basis described, "the parties were therefore aware of plaintiff's legal theory" even where the theory was mischaracterized (citation omitted)); *Lamborn v. Dittmer,* 873 F.2d 522, 526 (2d Cir.1989) (holding that the pretrial order did not adequately disclose a theory because it did not give notice of that theory); *In re Burzynski,* 989 F.2d 733, 738-39 (5th Cir.1993) (assessing whether plaintiff had stated cause of action by alleging the elements of each tort).

interference with existing or with prospective contractual relations. *Juliette Fowler Homes v. Welch Assocs., Inc.,* 793 S.W.2d 660, 665 (Tex.1990) ("Texas law protects existing and prospective contracts from interference."); *Exxon Corp. v. Allsup,* 808 S.W.2d 648, 659 (Tex.App.—Corpus Christi 1991, writ denied) ("Texas law protects prospective as well as existing contracts from third party interference."). Tortious interference with an existing contract consists of:

    (1) the existence of a contract subject to interference,

    (2) a willful and intentional act of interference,

    (3) such act was a proximate cause of damage, and

    (4) actual damage or loss occurred.

*Browning-Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 926 (Tex.1993).[15] Interference with prospective contracts has slightly different elements:

> (1) a reasonable probability that the parties would have entered into a contractual relationship,
>
> (2) an intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of harming the plaintiff,
>
> (3) the defendant lacked privilege or justification to do the act, and
>
> (4) actual harm or damage resulted from the defendant's interference.

---

[15]*See Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939 (Tex.1991) (setting out elements of cause of action for tortious interference); *Juliette Fowler Homes,* 793 S.W.2d at 664 (same); *see also Allsup,* 808 S.W.2d at 654 (applying elements); *CF & I Steel Corp. v. Pete Sublett & Co.,* 623 S.W.2d 709, 713 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.) (evaluating findings on elements).

*Allsup,* 808 S.W.2d at 659. These two torts differ primarily in that interference with prospective relations requires the plaintiffs to prove both that they had a reasonable probability of obtaining a contract[16] and that the defendant acted with malice.[17]

The pretrial order included the following "Additional Contested Issue[ ] of Fact":

Did Terry Thrift and/or EMIS Software, Inc. defame the Hubbards, interfere with business or contractual relationships of the Hubbards, or intentionally or recklessly inflict emotional distress on the Hubbards in the following transactions:

(1) Sunbelt Transformer

(2) Laventhol Horwath

(3) TFC Corporation

(4) Grammco/Andrews

---

[16]*See Caller-Times Publishing Co. v. Triad Communications, Inc.,* 855 S.W.2d 18, 21 (Tex.App.—Corpus Christi 1993, no writ) ("To prove tortious interference with prospective contracts or business relationships, the plaintiff must prove ... a contractual relationship that the plaintiff had a reasonable probability of realizing...."); *American Medical Int'l, Inc. v. Guirintano,* 821 S.W.2d 331, 337 (Tex.App.—Houston [14th Dist.] 1991, no writ) ("To recover on a cause of action for tortious interference with a prospective business relationship, the plaintiff must show: (1) there was a reasonable probability that he would have entered into a business relationship...."); *see also Verkin v. Melroy,* 699 F.2d 729, 733 (5th Cir.1983) (requiring knowledge of prospective relationship).

[17]*See CF & I Steel Corp.,* 623 S.W.2d at 715 ("Interference with a business relationship is similar to the tort of contract interference. It is not necessary to establish the existence of a valid contract, but the interference with a general business relationship is actionable only if the defendant's interference is proven to be motivated by malice."); *see also Deauville Corp. v. Federated Dep't Stores, Inc.,* 756 F.2d 1183, 1196 (5th Cir.1985) (holding that the difference between interference with contract and prospective relations is that second tort requires showing of "malice'); *Verkin,* 699 F.2d at 733 (requiring intent to harm).

While it is arguable whether the pleadings adequately distinguished between the two causes of action,[18] the pretrial order clearly identified both "business" and "contractual" relationships. Accordingly, we cannot say the magistrate judge abused his discretion in determining that the pretrial order gave Thrift sufficient notice of both claims.

## C

Peerless argues that the Assignment and Option Agreement ("A/O Agreement") was not ambiguous and that the district court should not have submitted the special interrogatory that asked the jury to determine whether the A/O Agreement had transferred ownership of EMIS 1.1 and 1.2 to Thrift. Whether a contract is ambiguous is a question of law. *Watkins v. Petro-Search, Inc.,* 689 F.2d 537, 538 (5th Cir.1982).[19] Accordingly, we review this issue

---

[18]Thrift contends that the pleading heading "Interference with Contractual Relationships" necessarily limits the Hubbards' pleading to existing contracts. The heading does not specify only existing contracts, however, and the term "Contractual Relationships" can encompass both existing and future relationships. Next, Thrift argues that the Hubbards' pleading allegations related only to existing contracts. Although we can identify statements implying only existing contracts, there are also references to future contracts. For example, allegation B.3 refers to "dealings" and "losses of ... referral." Moreover, the allegations allege both the knowledge of the prospective relationship and the intent to harm required to show malice. *See supra* note 11.

[19]*See also Anheuser-Busch Cos., Inc. v. Summit Coffee Co.,* 858 S.W.2d 928, 935 (Tex.App.—Dallas 1993, writ denied) ("Construction of an unambiguous contract is a legal issue to be decided by the court.... The question of whether a contract is ambiguous is a question of law." (citations omitted)), *cert. filed,* 63 U.S.L.W. 3161 (Aug. 30, 1994) (No. 94-379); *Staff Indus., Inc. v. Hallmark Contracting, Inc.,* 846 S.W.2d 542, 545-46 (Tex.App.—Corpus Christi 1993, no writ) ("Whether a contract is ambiguous is a question of law for the court to decide....").

*de novo. See Hanssen v. Qantas Airways Ltd.,* 904 F.2d 267, 269 (5th Cir.1990) (reviewing question of ambiguity *de novo* ).

A contract is ambiguous "when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning...." *Towers of Tex., Inc. v. J & J Sys., Inc.,* 834 S.W.2d 1, 2 (Tex.1992).[20] In making this determination, a court evaluates the language of the instrument in light of the surrounding circumstances existing at the time of the contract.[21]

---

[20]*See Watkins,* 689 F.2d at 538 (According to Texas law, "[a] contract is ambiguous when it is reasonably susceptible to more than one meaning, in the light of the surrounding circumstances and after applying established rules of construction."); *see also Kurtz v. Jackson,* 859 S.W.2d 609, 611 (Tex.App.—Houston [1st Dist.] 1993, no writ) ("A contract is ambiguous only when there is a genuine uncertainty which of two or more meanings is correct.... If there is but one reasonable interpretation of the contract, it is not ambiguous." (citations omitted)); *Staff Indus.,* 846 S.W.2d at 546 ("A contract, however, is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning."); *Loehr v. Kincannon,* 834 S.W.2d 445, 446 (Tex.App.—Houston [14th Dist.] 1992, no writ) (same).

[21]However, when a question relating to the construction of a contract or its ambiguity is presented, the court is to take the wording of the contract in the light of the surrounding circumstances, in order to ascertain the meaning that would be attached to the wording "by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended to mean."

*Watkins,* 689 F.2d at 538 (quoting *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981)); *see also Stephanz v. Laird,* 846 S.W.2d 895, 899 (Tex.App.—Houston [1st Dist.] 1993, writ denied) ("Whether a contract is ambiguous is a legal question, reviewable by an appellate court in light of the circumstances present when the parties entered into the contract."); *Staff Indus.,* 846 S.W.2d at 546 ("The intention of the parties is to be ascertained to the extent possible from the language of the contract itself, construed

The provision in the A/O Agreement stated:

> Thrift and Peerless intend that Thrift will provide a payment of $100,000 to Peerless for the purpose of making the payment to PECO to terminate the Definitive Agreement, and in exchange will receive: (a) title to Software, with Peerless retaining an exclusive license to use and market....

The definition section defined "software" as follows:

> "Software" shall mean all software products identified generally in Exhibit A to the Definitive Agreement, which is Attachment 1(a) to this Agreement (including source code, object code and related documentation and marketing information) all of which were assigned to Peerless under the Definitive Agreement.

The Agreement further provided:

> In consideration of the payment to Peerless of $100,000, Peerless assigns to Thrift all its rights, title and interest in the following property:

> (a) All Software including all copyrights, trade secret rights and other proprietary rights to software source code, object code and related documentation.

Lastly, Attachment 1(a) lists "EMIS (Executive Management Information System") as one of the software products.

Peerless argues that, because Exhibit A to the Definitive Agreement between PECO and Peerless (the "PECO Agreement") included only EMIS 1.0 at the time it was drafted, the A/O Agreement unambiguously transferred rights to only EMIS 1.0. Neither party contests that, at the time that Exhibit A to the PECO Agreement was drafted, EMIS only included version 1.0. At the time that the A/O Agreement was drafted and signed, however, EMIS included 1.0, 1.1,

---

in connection with the circumstances surrounding the execution of the contract. These surrounding circumstances include what the particular industry considered to be the norm or reasonable and prudent at the time." (citations omitted)).

19

and 1.2. The software "identified generally" in Exhibit A to the PECO Agreement was "EMIS." Nothing in the A/O Agreement clarifies what date the A/O Agreement intended to use as the benchmark—the date of the PECO Agreement with its Exhibit A or the date of the A/O Agreement with its Attachment 1(a). Consequently, the district court properly found that the A/O Agreement was ambiguous and submitted the question to the jury. *See Watkins,* 689 F.2d at 538 ("[O]nce the contract is found to be ambiguous, the determination of the parties' intent through the extrinsic evidence is a question of fact."); *see also Staff Indus.,* 846 S.W.2d at 546 ("When the contract contains an ambiguity, its interpretation becomes a question of fact based on the intention of the parties to it.").

Peerless also argues that, even if the A/O Agreement is ambiguous, the jury's finding that it transferred rights to all versions of EMIS to Thrift was against the great weight of the evidence, and, therefore, the district court should not have denied Peerless' request for a new trial. We will overturn a decision denying a motion for a new trial only where we find an abuse of discretion by the district court. *Jones v. Wal-Mart Stores, Inc.,* 870 F.2d 982, 986 (5th Cir.1989); *see also E.E.O.C. v. Clear Lake Dodge,* 25 F.3d 265, 271 n. 5 (5th Cir.1994) (stating that a district court may grant a new trial if the verdict is against the great weight of the evidence, but reviewing that decision for abuse of discretion). "[A]ll the evidence must be viewed in a light most favorable to the jury's verdict," *id.* at 987, and we will uphold the district court's denial unless the evidence points "so strongly

20

and overwhelmingly in favor of one party that ... [a] reasonable [jury] could not arrive at a contrary [decision]," *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969), and therefore the district court abused its discretion in letting the verdict stand. Thrift testified that he believed that the A/O Agreement transferred rights to all versions of EMIS. Moreover, the Hubbards' attorney testified that the contract between PECO and Peerless had not been incorporated into the A/O Agreement, and he conceded that contract terms generally are construed as of the date of formation. We hold that a reasonable jury could find that the A/O Agreement transferred rights to all three versions of EMIS to Thrift. Accordingly, we will not overturn the district court's refusal to disturb the jury's verdict on this issue.

**D**

Peerless asserts next that the district court erred when it held that, as a matter of law, Peerless had not proven its usury claim. " 'Usury' is interest in excess of the amount allowed by law." Tex.Rev.Civ.Stat.Ann. art. 5069-1.01(d) (West 1987). " 'Interest' is the compensation allowed by law for the use or forbearance or detention of money; provided however, this term shall not include any time price differential however denominated arising out of a credit sale." Tex.Rev.Civ.Stat.Ann. art. 5069-1.01(a) (West 1987). "The essential elements of a usurious transaction are (1) a loan of money; (2) an absolute obligation that the principal be repaid; and (3) the exaction from the borrower of a greater compensation than the amount allowed by law

for the use of money by the borrower." *Najarro v. SASI Int'l, Ltd.,* 904 F.2d 1002, 1005 (5th Cir.1990), *cert. denied,* 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991); *accord First Bank v. Tony's Tortilla Factory, Inc.,* 877 S.W.2d 285, 287 (Tex.1994). We construe the usury statute strictly, *First Bank,* 877 S.W.2d at 287 ("Usury statutes are penal in nature and should be strictly construed."), and favor Thrift whenever any doubt occurs, *see Tygrett v. University Gardens Homeowners' Ass'n,* 687 S.W.2d 481, 485 (Tex.App.—Dallas 1985, writ ref'd n.r.e.) ("Any doubt as to the intention of the legislature to punish the conduct of the party should be resolved in favor of the defendant.").

Peerless argues that, because Thrift advanced no new funds, the Second Note is usurious on its face. We disagree. In determining the effect of the Second Note, we consider all the relevant documents as well as the surrounding circumstances.[22] *Tygrett,* 687 S.W.2d at 485 ("The question of usury must be determined by a construction of all the documents constituting the transaction, interpreted as a whole, and in light of the attending circumstances."). Although the initial paragraph of the Second Note states that Peerless promises to pay $109,776.10, the remainder of the instrument clearly explains in its title that it is a "Revolving Credit Note" and also that the amount Peerless must pay is limited only to the unpaid principal and any interest due thereon.

---

[22]Thrift contends that the Second Note was a renewal of the First Note; the Hubbards do not agree with this characterization.

22

> The unpaid principal balance of this note at any time shall be the total amounts loaned or advanced hereunder by the holder hereof, less the amount of payments or prepayments of the principal made by or for the account of Maker. It is contemplated that the Maker may repay portions of the outstanding principal balance of this note at such time as it may receive payment from its account debtors and therefore, by reason of these prepayments hereon there may be such time when no indebtedness is owing hereunder....

Plaintiff's Ex. 21 (Feb. 19, 1987 Revolving Credit Note ("Second Note")). We presume that Thrift did not intend the Second Note to be usurious. *See Tygrett,* 687 S.W.2d at 485 ("[T]here is a presumption that the parties intended a nonusurious contract; when the contract by its terms, construed as a whole, is doubtful, or even susceptible to more than one reasonable construction, the court will adopt the construction which comports with legality."). Moreover, the Second Note contained a savings clause, and Texas courts have held that savings clauses demonstrate a party's intent that the instrument be nonusurious. *See F.S.L.I.C. v. Kralj,* 968 F.2d 500, 505 (5th Cir.1992) ("Texas state courts have construed savings clauses to defeat an interpretation of a contract that would violate the usury laws."). Accordingly, the Second Note obligated Peerless to pay no more than what was advanced, and thus is not usurious on its face.

Peerless also argues that, because the foreclosure satisfied the debt that the Hubbards and Peerless owed, Thrift's demand for pay-off constituted usury. Because the Second Note is not usurious on its face, Peerless bears the burden of proving usury. *See Najarro,* 904 F.2d at 1005-06 ("Where the transaction appears lawful on its face, the party claiming usury has the burden of proof.").

23

On May 20, 1987, Thrift sent a letter to Peerless demanding payment on the Second Note. *See* Plaintiff's Ex. 30 ("Demand Letter") ("This is to place in writing my verbal demand made this morning for pay off of the $109,776.10 Revolving Credit Note, dated February 19, 1987....  I demand that any payment received by you from this day forward be signed over to me until such time as principal and interest is paid.").  Peerless argues that this letter demanded payment of the face amount, $109,776.10.  We disagree.  Nowhere in the letter does Thrift demand $109,776.10—he merely demands payoff of the note.  Moreover, the demand for signed-over payments "until such time as principal and interest is paid" does not ask for more than what was currently due on the note.  If, as Peerless claims, nothing is due, then Thrift's letter demands nothing.[23]  Construing the Demand Letter in favor of legality, *see Tygrett,* 687 S.W.2d at 485 (presuming construction that is not usurious), we hold that it demands only the unpaid principal and accrued interest, however much that actually is. *Cf. Tanner Dev. Co. v. Ferguson,* 561 S.W.2d 777, 789 (Tex.1977) (refusing to consider demand letter usurious because it claimed unpaid *balance* and not full face amount of note).  Therefore, the district court correctly found as a matter of law that Peerless had failed to establish a claim for usury.

**E**

Peerless contends further that the district court improperly

---

[23]At the time Thrift wrote the letter, he believed that the stock transfer had not satisfied the original debt.

awarded annual compounding of the prejudgment interest on the $87,122.85 note.  The parties agree that the note provided the rate applicable for prejudgment interest—eighteen percent (the contract specified the "highest rate allowed by applicable law").  They disagree as to whether and to what extent compounding is allowed.

Because the note provided the rate for prejudgment interest, we look first to determine if the note also provided guidance on compounding.  *Cf. FDIC v. Blanton,* 918 F.2d 524, 532-33 (5th Cir.1990) (refusing to apply statutory rate when parties had agreed to different rate).  Thrift argues that the note parallels the contract in *Texon Energy Corp. v. Dow Chemical Co.,* 733 S.W.2d 328 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.), which provided for monthly compounding because it applied an annual interest rate monthly.  *Id.* at 331.  Here, the note also applies an annual interest rate, but nothing in the note defines the frequency of application.  Accordingly, the note is not dispositive on this issue.[24]

"The Texas law of prejudgment interest can fairly be described as bewildering."  *Concorde Limousines, Inc. v. Moloney Coachbuilders, Inc.,* 835 F.2d 541, 548 (5th Cir.1987).  *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 554 (Tex.1985), provides the benchmark for awards of prejudgment interest.  Although *Cavnar* was a wrongful death case, Texas courts have

---

[24]Peerless argues that allowing compounded interest would impermissibly add to the contract.  Awards of prejudgment interest are damages, however, and need not be specified in the contract nor agreed to by the parties.

extended its application to cases involving economic damages.[25]
Under *Cavnar,* "a prevailing plaintiff may recover prejudgment
interest compounded daily (based on a 365-day year) on damages that
have accrued by the time of judgment." *Cavnar,* 696 S.W.2d at 554
(emphasis omitted).

After *Cavnar,* the Texas legislature enacted reform statutes
specifying judgment interest in particular types of cases.
Peerless argues that, because the note determined the interest
rate, simple interest under article 5069-1.05, § 1 should apply.[26]
Section 1, however, defines only the *rate;* it is silent as to
compounding. Therefore, we revert to the common law and *Cavnar.*
*Spangler v. Jones,* 861 S.W.2d 392, 398 (Tex.App.—Dallas 1993)
(holding that, where statute did not apply, *Cavnar* remained the
law).

Apparently, the district court awarded annual compounding

---

[25]*See Enterprise-Laredo Assocs. v. Hachar's, Inc.,* 839
S.W.2d 822, 839 (Tex.App.—San Antonio 1992, writ denied)
("[P]rejudgment interest may be awarded on a breach of contract
claim."); *O'Reilly v. Grafham,* 797 S.W.2d 399, 401-02
(Tex.App.—Austin 1990, no writ) (holding that *Cavnar* rule applies
to "non-personal injury, economic damages" cases).

[26]Tex.Rev.Stat.Ann. art. 5069-1.05, § 1 (West Supp.1995)
provides:

> All judgments of the courts of this state based on a
> contract that provides for a specific rate of interest
> earn interest at a rate equal to the lesser of:
>
> (1) the rate specified in the contract; or
>
> (2) 18 percent.

because one holding in *Cavnar* looked to article 5069-1.05, § 2.[27] That *Cavnar* holding, however, only applies when damages are unascertainable under the contract. In this case, the note clearly defined the damages, and the incorporation of § 2 is not necessary.[28] Consequently, *Cavnar's* default specification of daily compounding applies, and the district court should have calculated prejudgment interest on the note with daily compounding. *See State v. Enterprise Bank,* 873 S.W.2d 117, 119 (Tex.App.—Waco 1994, writ denied) (explaining that daily compounding applies unless statute dictates otherwise); *Ciba-Geigy Corp. v. Stephens,* 871 S.W.2d 317, 321-22 (Tex.App.—Eastland 1994, writ denied) (same); *O'Reilly,* 797 S.W.2d at 401 (applying daily compounding to economic damages

---

[27]Tex.Rev.Stat.Ann. art. 5069-1.05, § 2 (West Supp.1995) provides for judgment interest where no contract has specified the rate.

[28]Because incorporation of § 2 is not necessary, we need not address the conflict in Fifth Circuit law concerning what form of compounding should apply *when § 2 is incorporated. Compare Law Offices of Moore & Assocs. v. Aetna Ins. Co.,* 902 F.2d 418, 421 (5th Cir.1990) (daily compounding) and *Concorde Limousines,* 835 F.2d at 550 (daily compounding) *with Guest v. Phillips Petroleum Co.,* 981 F.2d 218, 223 (5th Cir.1993) (annual compounding). We note, however, that we would be bound by the earliest decision, *Concorde Limousines,* to apply daily compounding. *See In re Howard,* 972 F.2d 639, 641 (5th Cir.1992) (viewing earlier decision as binding when conflict exists); *see also Broussard v. Southern Pac. Transp. Co.,* 665 F.2d 1387, 1389 (5th Cir.1982) (en banc) ("The general rule in this Circuit is that one panel cannot overrule another panel."). The Texas courts have exhibited a similar conflict. *Compare Spangler,* 861 S.W.2d at 399 (using daily compounding and overruling *OKC Corp., infra) and City of Houston v. Wolfe,* 712 S.W.2d 228, 230 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd) (daily compounding) *with Enterprise-Laredo Assocs.,* 839 S.W.2d at 839 (annual compounding) *and OKC Corp. v. UPG Inc.,* 798 S.W.2d 300, 307 (Tex.App.—Dallas 1990, writ denied) (annual compounding), *overruled as stated in Spangler,* 861 S.W.2d at 399.

cases); *Allen v. Allen,* 751 S.W.2d 567, 576 (Tex.App.—Houston [14th Dist.] 1988, writ denied) (compounding daily under *Cavnar* ).[29]

The Hubbards argue additionally that the district court erred when it set the start of prejudgment interest accrual on their intentional infliction of emotional distress claims at 180 days after the filing of those claims.  They challenge both the 180 day clock and its start on the date of filing of the emotional distress claims rather than that of the original suit.

Article 5069-1.05, § 6 provides that prejudgment interest begins to accrue 180 days after the date the defendant first received written notice of the claim or on the day suit is filed, whichever occurs first.  The Hubbards argue that the filing of their original suit in February, 1988, triggered the accrual of prejudgment interest.  We disagree, because the Hubbards did not allege intentional infliction of emotional distress in their original complaint.  The purpose of prejudgment interest is to encourage settlement. *Cavnar,* 696 S.W.2d at 554.  If a defendant has no notice of a claim, there is nothing to encourage.  Thrift first received written notice of the Hubbards' emotional distress claims when the Hubbards amended their pleadings to include these claims.  Consequently, prior to the first notice, Thrift could not have settled the claim, and the district court properly used the date of the amended complaint to trigger the accrual of prejudgment

---

[29]Peerless also argues that compounding would result in a usurious rate.  Usury however does not apply to *judicial* awards of prejudgment interest. *Sage St. Assocs. v. Northdale Constr. Co.,* 863 S.W.2d 438, 440 (Tex.1993).

interest.

The district court erred, however, in applying the 180-day delay. The 180-day delay specified in the statute only applies to the "first written notice" portion. *Hughes v. Thrash,* 832 S.W.2d 779, 787 (Tex.App.—Houston [1st Dist.] 1992). Thrift first received written notice of the emotional distress claim on November 13, 1990, when the Hubbards amended their complaint. Therefore, 180 days after that first written notice corresponded to May 12, 1991. "The day suit was filed," however, was November 13, 1990, and the statute starts accrual of prejudgment interest on the earlier of the two dates. Consequently, because November 13, 1990 ("the day suit was filed") predated May 12, 1991 (180 days after the first written notice), prejudgment interest on the Hubbards' emotional distress claims should have started accruing on November 13, 1990, the date the Hubbards amended their suit to allege emotional distress.

### III

For the foregoing reasons, we AFFIRM all portions of the district court's judgment except the awards of prejudgment interest to Thrift on the $87,122.85 note and to the Hubbards on their intentional infliction of emotional distress claims. We VACATE these two awards and REMAND them to the district court for proper recalculation.

29